UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

JULIE DELANEY and
WILLIAM P. DELANEY

               Plaintiffs,

      v.

ELI LILLY AND COMPANY,

               Defendant.

CIVIL ACTION No. 05-CV-10241 (MLW)

## ELI LILLY AND COMPANY'S MOTION TO STRIKE
## STATEMENT OF PHILIP CAFFERTY

Defendant Eli Lilly and Company ("Lilly") hereby moves this Court to strike the statement of Mr. Philip Cafferty ("Mr. Cafferty").  Any testimony from Mr. Cafferty is unreliable and adds no value to this case.

Plaintiff Julie Delaney ("Mrs. Delaney") alleges injuries caused by *in utero* exposure to a DES product taken by her mother Barbara O'Leary ("Ms. O'Leary") in 1969-'70.  Ms. O'Leary testified at deposition that she filled her DES prescription at Hingham Pharmacy in Hingham, Massachusetts.  Plaintiffs have provided no statements from a pharmacist or other employee from this pharmacy.  In order to prove that the pharmacy that Ms. O'Leary used dispensed a Lilly product to Ms. O'Leary, Plaintiffs have introduced a statement from Mr. Cafferty on the Massachusetts DES market during the 1960's.

Mr. Cafferty is now deceased and unavailable to testify.  When he was alive, Mr. Cafferty was not an expert on the stocking and dispensing practices of Massachusetts pharmacies.  Rather, he was a retired pharmacist who worked as an investigator for Plaintiffs' attorney, Aaron Levine.  In 2003, Mr. Cafferty conducted a very limited and unscientific "survey" of pharmacists in the Boston area, reviewed approximately 125 pharmacist statements

compiled by Plaintiffs' attorneys, and drew on his personal experience as a pharmacist to draft

his Statement. As Lilly will demonstrate below, none of these sources were sufficiently reliable

to allow Mr. Cafferty to form an expert opinion on the DES market in Massachusetts that would

pass the *Daubert* test. Therefore, Lilly respectfully requests that this Court strike Mr. Cafferty's

Statement from the record.

### A.    The *Daubert* Standard.

"Federal Rule of Evidence 702 'assign[s] to the trial judge the task of ensuring that an

expert's testimony both rests on a reliable foundation and is relevant to the task at hand.'"

*Cipollone v. Yale Indus. Prods., Inc.*, 202 F.3d 376, 380 (1st Cir. 2000) (quoting *Daubert*, 509

U.S. at 597). The Rule provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact
> to understand the evidence or to determine a fact in issue, a witness qualified as
> an expert by knowledge, skill, experience, training, or education may testify
> thereto in the form of an opinion or otherwise, if (1) the testimony is based upon
> sufficient facts or data, (2) the testimony is the product of reliable principles and
> methods, and (3) the witness has applied the principles and methods reliably to
> the facts of the case.

In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, the Supreme Court established the gate-

keeping role of trial judges in evaluating the admissibility of scientific evidence pursuant to

Federal Rule of Evidence 702. *Daubert,* 509 U.S. 579, 592-5 (1993). The court set forth

guidelines for federal judges in their evaluation of expert testimony under a two-pronged test to

determine (1) whether the theory or methodology underlying the testimony is reliable and (2)

whether the expert's theory or methodology will assist the fact-finder. *See id.*

Rule 702 and *Daubert* aid judges to ensure that proffered expert testimony "is the product

of reliable principles and methods." Fed. R. Evid. 702. "[T]he trial court must decide whether

the proposed testimony, including the *methodology* employed by the witness in arriving at the

proffered opinion, 'rests on a *reliable foundation* and is *relevant* to the facts of the case.'" *Ed*

*Peters Jewelry Co. v. C. & J. Jewelry Co*., 124 F.3d 252, 259-60 (1st Cir. 1997) (citing *Daubert*, 509 U.S. at 597) (expert testimony that was "internally inconsistent and unreliable" excluded) (emphasis in the original).

The focus of the analysis under *Daubert* is on the principles and methodology used by the expert, not the actual conclusions reached by the expert. *See Daubert,* 509 U.S. at 595. The reliability requirement ensures that an expert's analysis is based on the scientific method and supported by appropriate validation. *See id.* at 590. Requiring that testimony be relevant to the facts of the case ensures that such testimony will assist the fact-finder to understand the evidence or to determine a fact in issue, instead of prejudicing the other party or confusing the court. *See Kumho Tire Co. v. Carmicheal*, 526 U.S. 137, 152 (1999); *Daubert*, 509 U.S. at 590-2, 595. Federal District Courts serve as the gatekeepers to ensure that any expert testimony advances the issues in dispute at trial. *See Daubert,* 509 U.S. at 597. The trial court's role as gatekeeper prevents "….the introduction of evidence that is not relevant or is not reliable." *U.S. v. Patrick,* 6 F.Supp. 2d 51, 55 (D. Mass. 1998).

Courts typically consider several factors when assessing the reliability of proffered expert testimony. These factors, derived from *Daubert*, include:

> (1) whether the opinion can be or has been tested; (2) whether the theory or technique on which the opinion is based has been subjected to peer review and publication; (3) the technique's known or potential error rate; (4) the existence and maintenance of standards controlling the technique's operations; and (5) "general acceptance."

*Sutera v. Perrier Group of America, Inc.*, 986 F. Supp. 655, 661 (D. Mass. 1997); *see also United States v. Sampson*, 335 F. Supp. 2d 166, 218-219 (D. Mass. 2004) (identifying the five *Daubert* factors). *Daubert* requires that the expert testimony offered be based on a technique that can be or has been tested by the community of which the expert is or purports to be a

member.  In Mr. Cafferty's case, his survey and other market research "investigations" have not

been subjected to any such evaluation.  As a result, Mr. Cafferty's testimony would contravene

this central requirement of *Daubert* because upon even a brief review it becomes clear that Mr.

Cafferty's survey is not based on *any* theory or test.  *See* 509 U.S. at 593.[1]  Viewing Mr.

Cafferty's lack of credentials and "survey" through this framework demonstrates the unreliability

and, therefore, inadmissibility of his proffered testimony.

**B.    Mr. Cafferty's "Survey" Does Not Qualify Him as an Expert on the Massachusetts DES Market Under *Daubert***

Mr. Cafferty was a pharmacist, not a market researcher or statistician.  Transcript of

Deposition of Philip Cafferty ("Cafferty Tr.") in *Dean v. Eli Lilly and Company*, Civ. Action No.

02-CV-11078 (RGS), at 15-16, 30, 41-42 (attached as Ex. 1).  He holds no degree in survey

research, has completed no courses in survey techniques, and has never conducted a survey

outside of the context of his work for Plaintiffs' counsel; he has no experience in the very field in

which he is being offered as an expert.  *Id.*

Mr. Cafferty's lack of expertise produced a "survey" that is wholly unreliable under

*Daubert.*  In total, Mr. Cafferty interviewed approximately 200 pharmacists from the 2003

Boston, South Shore, Natick, and Framingham Yellow Pages.  *Id.* at 9.  Of those 200

pharmacists, only 16 or 17 actually practiced pharmacy in the 1950's and 1960's.  *Id.* at 12.  Mr.

Cafferty admitted that his survey sample was miniscule in light of the fact that there were at least

2,500-3,700 pharmacists practicing in Massachusetts during the 1960's.  *Id.* at 76.  There was no

methodology for Mr. Cafferty's survey, aside from asking any pharmacist he spoke with who

happened to practice in the 1950's and 1960's whether they recalled the brand of DES they

---

[1]Mr. Cafferty's opinion regarding Lilly's DES market share also fails to satisfy *Daubert's* requirement that an expert's study be subject to peer review and publication.  *See Daubert*, 509 U.S. at 593-95.

dispensed. *Id.* at 9-10. Additionally, Mr. Cafferty acknowledged that he did not methodically document his survey results. *Id.* at 20-22, 84. Mr. Cafferty never consulted any expert to ensure that his survey was statistically significant or representative of the Massachusetts market, in fact, he could not even define those terms. *Id.* at 29-32. Moreover, Mr. Cafferty never took any steps to verify that he was obtaining accurate results from the pharmacists with which he spoke. *Id.* at 38-39. Taken together, these facts demonstrate that Mr. Cafferty's "survey" did not make him an expert on the Massachusetts DES market in the 1960's.

> **C.     Mr. Cafferty's Review of Pharmacists Statements Compiled By Plaintiffs' Attorneys Does Not Qualify Him as an Expert on the Massachusetts DES Market Under *Daubert***

In addition to conducting his survey, Mr. Cafferty reviewed a set of approximately 125 statements from pharmacists compiled by Plaintiffs' attorneys. *Id.* at 105. These statements were obtained in suits brought against Lilly; their selection was hardly random or representative, and Mr. Cafferty's review of them has none of the hallmarks of a scientific survey. Mr. Cafferty took no steps to verify the accuracy of those statements, but merely relied on the "good judgment" of Plaintiffs' counsel. *Id.* Moreover, Mr. Cafferty took no steps to test the memories of the pharmacists whose statements he reviewed. *Id.* at 105-06. Without more, Mr. Cafferty's familiarity with the pharmacist statements of Plaintiffs' counsel does not make him a reliable expert on the Massachusetts DES market under *Daubert*.

> **D.     Mr. Cafferty's Experience as a Pharmacist Does Not Qualify Him as an Expert on the Massachusetts DES Market Under *Daubert***

Mr. Cafferty's limited experience as a pharmacist and Lilly employee is not relevant to this case. Ms. O'Leary allegedly filled her DES prescription from a pharmacy in Hingham in 1969-'70. From 1961 until 1965, Mr. Cafferty worked as a licensed pharmacist in two pharmacies in Rhode Island. Cafferty Tr. at 52-54. He did not work in Massachusetts as a

licensed pharmacist until 1984 at the earliest. *Id.* at 54. From 1965 until DES went off the market in 1971, Mr. Cafferty worked for Eli Lilly and Company in various capacities. During his employment with Lilly, Mr. Cafferty never detailed DES, and never had reason to pay attention to the DES market. *Id.* at 65, 77. Mr. Cafferty's experience as a licensed pharmacist and Lilly employee was obtained at the wrong places, at the wrong times, and with respect to the wrong drugs to provide him with any expertise on the Massachusetts DES market during the 1960's.

**<u>CONCLUSION</u>**

For the foregoing reasons, Lilly respectfully requests that the Court strike Mr. Cafferty's Statement from the record. Lilly submits that Mr. Cafferty's Statement is unreliable and will not assist the Court in understanding the evidence, thus warranting its exclusion pursuant to Federal Rule of Evidence 702 and *Daubert*.

## REQUEST FOR ORAL ARGUMENT

Pursuant to L.R. 7.1, Lilly hereby requests a hearing on this motion.

Respectfully submitted,

FOLEY HOAG LLP

/s/ Brian L. Henninger
James J. Dillon (BBO # 124660)
Brian L. Henninger (BBO # 657926)
FOLEY HOAG LLP
155 Seaport Boulevard
Boston, MA 02111-2600
(617) 832-1000

Dated:  November 20, 2006

## LOCAL RULE 7.1(A)(2) CONFERRAL CERTIFICATION

I, Brian L. Henninger certify that on November 20, 2006, I conferred with Plaintiffs' counsel regarding Lilly's Motion to Strike Statement of Harold Sparr.  Plaintiffs' counsel does not consent to the Motion.

/s/ Brian L. Henninger

# Ex. 1

```
00001
  1                    Volume: 1
  2                    Pages: 1 - 110
  3                    Exhibits: 1-2
  4        IN THE UNITED STATES DISTRICT COURT
  5        FOR THE DISTRICT OF MASSACHUSETTS
  6   C.A. No. 02-CV-11078-RGS
  7   -----------------------------x
  8   ELLEN J. DEAN,
  9        Plaintiff
 10
 11   v.
 12
 13   ELI LILLY AND COMPANY,
 14        Defendant
 15   -----------------------------x
 16
 17        DEPOSITION OF PHILIP J. CAFFERTY
 18        Friday, August 22, 2003, 11:04 a.m.
 19              Foley Hoag LLP
 20   155 Seaport Boulevard, Boston, Massachusetts
 21
 22
 23
 24        Reporter:  Caroline T. Renault, CSR/RPR
```

00009

1    A. That's correct.

2    Q. How did you get the names of pharmacists to

3  call up?

4    A. Yellow Pages. I went through the Yellow

5  Pages and called the pharmacy and asked for the name

6  of the pharmacist.

7    Q. How did you decide what pharmacies are listed

8  in the Yellow Pages to call?

9    A. I called all of them, all the ones in the

10  Yellow Pages. I completed the Boston, the South

11  Shore, and western portion of the state, the Natick

12  and Framingham areas. I still have others to call.

13    Q. So I'm clear, you went to the Yellow Pages in

14  2003, is that correct?

15    A. Correct.

16    Q. And you found all the pharmacies, is that

17  right?

18    A. I called all the pharmacies listed.

19    Q. And you called all the pharmacies and what

20  did you ask them?

21    A. I told them who I was. My purpose for the

22  research was to find out if they were practicing

23  pharmacists back in the late fifties or early

24  sixties, and if they were, do they recall

00010

1 diethylstilbestrol?  If they responded

2 affirmatively, I would ask them what particular

3 brand of DES they were using.

4    Q. Now, do you have a set of questions that you

5 were given to ask these people?

6    A. No.  I pretty much was on my own.

7    Q. You were on your own?

8    A. Aaron did not give me questions.  Is that

9 what you are asking?

10    Q. Yes.

11    A. No, he did not give me a list of questions.

12    Q. You were informed what you were supposed to

13 find?

14    A. Yes.

15    Q. Did you suggest to any of these people when

16 you called them the names of any companies that made

17 DES?

18    A. No, I did not.

19    Q. Now, let me ask this:  Before you were

20 engaged by Mr. Levine about three months ago, had

21 you ever done any market research before?

22    A. Well, part of my responsibility with Lilly

23 was to do market research as far as the different

24 territories I had.  Part of my responsibility with

00012

1    A. Well, I didn't -- I would say a lot of them

2    were very young people.  They were not even born

3    back in the 1960s, but of those that I spoke to,

4    16 to 17 answered affirmatively they had DES, and

5    everyone of them was Lilly.

6    Q. Mr. Cafferty, I didn't ask that question.

7        Mr. Cafferty, of the people that you

8    spoke to, many of whom were too young to have been

9    practicing in the fifties and sixties, my question

10   to you is how many of them were practicing

11   pharmacists in Massachusetts in the 1960s?

12   A. I would say the 16 to 17 that I referred to.

13   Q. So the 16 to 17 that you referred to is a

14   number that encompasses both people practicing in

15   the fifties and sixties, is that correct?

16   A. Yes, that recall DES.  That was my question

17   to them.

18   Q. Have you done any research to find out how

19   representative those 16 or 17 people are of the

20   number of pharmacists who were practicing in

21   Massachusetts in the 1950s and 1960s?

22   A. I don't fully understand that question, Jim.

23   Q. How many pharmacists were practicing in

24   Massachusetts in the 1950s and sixties?

**Cafferty, Philip (8/22/03)**                    **Page 12**

00015
1 the pharmacists who you did speak to about what you

2 were doing.

3    A. I told them who I was.

4    Q. What did you say when you said who you were?

5    A. "Good afternoon.  My name is Phil Cafferty.

6 I'm doing some market research.  Were you practicing

7 pharmacy back in the late fifties or early sixties?"

8    Q. Did you say for whom you were doing market

9 research?

10    A. I did not identify Aaron Levine, no.  I just

11 said I was doing some market research.

12    Q. Did you identify you were doing market

13 research in support of litigation?

14    A. No, I did not.

15    Q. Did you tell anybody that you were, in fact,

16 experienced as a market researcher?

17    A. No, I did not.  Not in so many words, no.

18    Q. Did you lead people to understand you, in

19 fact, were an experienced market researcher?

20    A. By the questions I was asking, I could assume

21 they were probably figuring I was a market

22 researcher of some type.

23    Q. Now, before when I asked you about market

24 research, you told me about working for Lilly.  Have

**Cafferty, Philip (8/22/03)**                    **Page 15**

00016

1 you ever done any course work at any institution

2 about market research?

3    A. Any what?

4    Q. Course work.

5    A. Horse work?

6    Q. Course work.

7    A. Course work?

8    Q. Have you taken any courses in market

9 research?

10    A. Well, I had one year out in Indianapolis

11 working for Eli Lilly in marketing and one year of

12 market research in marketing plans.

13    Q. We will come to that.

14        I take it your duties in Indianapolis in

15 1972 --

16    A. Correct.

17    Q. -- did not involve doing market research for

18 a particular --

19        MR. LEVINE: I'm going to object. He

20 just said that it did.

21        MR. DILLON: Well, I'm now asking him --

22    A. I did market research for both Keflin and

23 Keflex in 1972. Those were two products I was

24 responsible for.

00020

1    Q. Well, we will come to sales. Let's focus on

2    your market research.

3    A. That I was doing for Mr. Levine, no, I did

4    not.

5        MR. LEVINE: I think he did some market

6    research for Lilly ongoing through some old

7    prescriptions.

8        THE WITNESS: That's what I was trying

9    to get out, but Jim doesn't want to hear that yet.

10        MR. DILLON: I'm talking about the

11   market research in the last three months.

12        THE WITNESS: I was trying to get to

13   that, Aaron, but Jim doesn't want to hear it.

14   Q. That's not true. I want to keep this in

15   order so I can follow what we are doing.

16   A. Okay.

17   Q. What sort of notes do you have about the

18   conversations that you have had?

19   A. Just whether or not the pharmacists had a

20   recollection of the DES and what brand he used.

21   Q. Now, when you asked him about recollection of

22   DES, what do you say? What exactly do you say to

23   them?

24   A. If they said yes, they were practicing

**Cafferty, Philip (8/22/03)**                    **Page 20**

00021

1  pharmacy back in the early sixties rather than the

2  late fifties, I would ask them if they recalled

3  diethylstilbestrol.  If they answered in the

4  affirmative, I would ask what manufacturers they

5  carried.

6      Q. And would you ask them what manufacturers

7  they carried in 1954 or in 1961?

8      A. I said late fifties or early sixties.  I

9  didn't go back to 1954, but I would say late fifties

10  or early sixties.

11      Q. When you say "late fifties," what do you

12  mean?

13      A. '58, '59 -- '57, '58, '59.

14      Q. Okay.  Did you ask these people the

15  wholesalers from which they purchased their drug?

16      A. Some of them volunteered that information.

17  For example, here in Boston, the big wholesalers

18  were Daley, McKesson and Gilman.

19      Q. Did you ask the people that you spoke to in

20  your market research about the wholesalers?

21      A. Some of them volunteered that information.  I

22  didn't specifically ask.

23      Q. If they volunteered the information, did you

24  make notes about that?

00022

1    A. On some of them I did, yes.

2    Q. And some of them you didn't, is that right?

3    A. If they mentioned a wholesaler, I probably

4 wrote it down.

5    Q. So in addition to the list of 16 or 17

6 pharmacists, you have got some notes that you took

7 on these conversations, is that correct?

8    A. Not extensive notes, but, you know, if they

9 have used DES, what brand it was.  That was the

10 basis of my conversations with them, and for four or

11 five I found out wholesalers.

12    Q. You think four or five, they told you of the

13 wholesalers?

14    A. I believe so.  I didn't ask specifically what

15 wholesaler.  They said it.  That was not part of my

16 agenda.

17    Q. Did you ask these pharmacists if they

18 purchased drugs directly from any pharmaceutical

19 companies?

20    A. In the case of Lilly, they could not purchase

21 directly.

22    Q. I knew that, but I'm wondering if in your

23 interviews you asked the pharmacists you spoke to if

24 they purchased drugs directly from any

00029

1    Q. Okay. Had you seen an earlier version of the

2    report before July 14th?

3        MR. LEVINE:  I believe there is a June

4    9th report.

5    A. There was one.  There was one.  I made

6    corrections on that.  This is the final copy.

7        MR. LEVINE:  I think there is an earlier

8    report.

9        MR. DILLON:  Okay.  I will also ask for

10   the June 9th report.

11       (Document(s)/information request.)

12   Q. Now, before we go into Exhibits 1 and 2 in

13   any more detail, I have a lot of questions, but

14   turning back to your market research, did you make

15   any reference to any statistician or any other

16   professional help in determining whether the sample

17   that you had of 16 or 17 pharmacists was of

18   sufficient size to make some real conclusions about

19   the nature of the market for DES in Massachusetts in

20   the fifties and sixties?

21   A. Out of probably 200 pharmacists I called, so

22   16, so roughly 8 percent of the pharmacists I spoke

23   to were around back in the late fifties or early

24   sixties, so what number is statistically

00030

1  significant?  Is 8 percent significant?

2    Q. That's my question to you.

3    A. I would think that it would be significant.

4    Q. You think 8 percent would be statistically

5  significant?

6    A. I think so.  I am not a statistician.

7    Q. When you say you think so, what is it based

8  on?

9    A. Just the fact it's 8 percent, 8 percent of

10  the population I spoke to.

11    Q. 8 percent of the population you spoke to was

12  there.  What is 16 out of 900, the number of

13  pharmacists that might have been practicing in the

14  fifties and sixties?

15    A. Out of 900?

16    Q. Yeah.

17    A. That would be about 1.8 percent probably.  I

18  don't have a calculator.

19    Q. Do you think that would be a significant

20  enough number that you could draw conclusions you

21  could rely on from 1.8 percent?

22    A. 16 out of 900 would not be nearly as

23  significant as 16 out of 200.

24    Q. Okay.  Well, Mr. Cafferty, you understand

00031

1  that the 200 that you called are pharmacists who

2  were practicing in pharmacy in Massachusetts in the

3  year 2003?

4    A. Correct.

5    Q. Is that correct?

6    A. Correct.

7    Q. So the relevant population that you want to

8  find out about are pharmacists who were practicing

9  in the 1950s and sixties, isn't that right?

10    A. Correct.

11    Q. So the relevant number then is really 16 out

12  of the 600 to 900 pharmacists that were practicing

13  in Massachusetts then, isn't that right?

14    A. However, I have not called 600 pharmacies

15  yet. I probably will when I conclude my market

16  research because I still have quite a bit of the

17  state to call.

18    Q. But at present you agree then that the number

19  of responses you got is not a statistically

20  significant representation of the pharmacists who

21  were, in fact, practicing in the fifties and

22  sixties?

23        MR. LEVINE: I object. That's not what

24  he said.

**Cafferty, Philip (8/22/03)**                    **Page 31**

00032

1      MR. DILLON:  If it's not what he said --

2      MR. LEVINE:  He is not a statistician.

3    A. That's what I said.

4    Q. You are not a statistician?

5    A. That's what I said.

6    Q. You have no idea whether 16 out of 900 is

7  adequate or not?

8    A. I'm not sure if that is a significant number.

9  I'm not a statistician.  I'm a market researcher and

10  a pharmacist.

11    Q. Have you made -- have you dealt with anybody

12  who could help you to find out if the 16 you got

13  are, in fact, a representative group from the

14  pharmacists that were practicing in the 1950s and

15  1960s?

16    A. Have I?  I have not dealt with anybody yet,

17  but I'm sure I could find a statistician that could

18  tell me if it was a significant number.

19    Q. Do you intend to do that?

20      MR. LEVINE:  It wouldn't be his

21  intention.  It would be my intention, and we intend

22  to do that.

23      MR. DILLON:  Okay.

24    Q. In addition to just the numbers of

00038

1    Q. But with respect to the market research you

2    have done, I take it you haven't made any inquiry as

3    to whether the DES that those pharmacists remember

4    were 5 and 25 or not, is that right?

5    A. Correct.

6    Q. So as far as your market research goes, they

7    could have been talking about any dosage of DES,

8    isn't that right?

9    A. They could have been.  However, I suspect

10   it's primarily the 5 and 25.

11   Q. But that's your suspicion, is that right?

12   A. Right.   Only my own market research.

13   Q. If I wanted to cross-check what you have done

14   so I could try and figure out if, in fact, what you

15   have done is recorded accurately, how would I do

16   that?

17   A. I suspect you would have to call the same

18   pharmacists I called and talk to the same people I

19   talked to.  I will send you that list.

20   Q. Okay.  Is there anything else I would need to

21   do to know what questions you asked?

22   A. I have told you basically the kinds of

23   questions I have asked.  I have identified myself,

24   told them I was doing some market research, inquired

**Cafferty, Philip (8/22/03)**                    **Page 38**

00039

1 if they were practicing in the late fifties or

2 sixties, and if they had been, do they recall what

3 kind of diethylstilbestrol they dispensed?

4    Q. Okay. Do you know if you have an error rate

5 in the methodology you have used for your market

6 research, plus or minus?

7    A. I can only go on what these pharmacists told

8 me. As far as error rate, I would have to say my

9 information is 100 percent accurate. Why would they

10 lie to me?

11    Q. They may not lie to you. Do you know if

12 they, in fact, are accurate in their recollections?

13    A. For the most part. If they said they have

14 been practicing during that time period, when I

15 asked them what brands of DES they used, they

16 responded spontaneously, immediately that it was

17 Lilly.

18    Q. Do you intend to publish the market research

19 that you have done?

20    A. Publish it in a journal?

21    Q. Anyplace.

22    A. I have no intention of publishing unless

23 Aaron does. I'm not a publicist.

24    Q. What are the steps you are going to take next

**Cafferty, Philip (8/22/03)**                    **Page 39**

00041

1    Q. Mr. Cafferty, I have a limited amount of

2   time.  I'm not sure I am done with the methodology

3   that you are using, but let me move on because I

4   want to cover some things in this limited window of

5   two hours.  Let me ask you about your educational

6   background.

7    A. Okay.

8    Q. I take it that you graduated from high school

9   in 1957, is that correct?

10    A. Correct.

11    Q. What high school was that?

12    A. LaSalle Academy, Providence, Rhode Island.

13    Q. Now, when you were in LaSalle Academy in

14   Providence, Rhode Island, what courses did you take?

15    A. I was in the science curriculum, so biology,

16   chemistry, I think zoology.  It was a science

17   curriculum, whatever that entailed.  I didn't have

18   any kind of typing.  I missed out on that stuff,

19   unfortunately.

20    Q. And I understand you then went to pharmacy

21   school --

22    A. Yes.

23    Q. -- at the University of Rhode Island?

24    A. Right.

**Cafferty, Philip (8/22/03)**                    **Page 41**

00042

1   Q. Is that right?

2   A. Right.

3   Q. You graduated in 1961?

4   A. Correct.

5   Q. Okay.

6   A. I was going to say the first year I started

7   down at the University of Rhode Island was 1957.

8   That was the first year I was at URI. I went to the

9   Providence College of Pharmacy in Providence. Back

10   then a person starting pharmacy school, more than

11   likely his father owned a pharmacy, so four years

12   later he graduated and became a pharmacist. When I

13   started back in '57, 27 of us started my freshman

14   year, and at the end of four years only three out of

15   27 graduated. Another five or six stayed on for an

16   additional year. I felt very good about that.

17   Q. Okay. Do I take it then that you got a

18   license as a pharmacist in 1961, is that right?

19   A. Correct.

20   Q. And that would have been a license in the

21   State of Rhode Island, is that correct?

22   A. Right.

23   Q. Do I understand correctly that until you were

24   a licensed pharmacist, you were not allowed to fill

00052

1    Q. Where did you do your active duty?

2    A. Fort Dix for basic training and Fort Sam

3   Houston in Texas for my medical training.

4    Q. You said for your medical training?

5    A. I was a corpsman. I spent about a year and a

6   half in the Army and transferred to the Air National

7   Guard, and I spent one summer in Camp Drum, New

8   York. I was in the Howitzer Battalion. I

9   transferred to the National Guard, basically, Otis

10   Air Force Base, which was a lot better than Camp

11   Drum, New York.

12    Q. And when you finished your active duty, did

13   you go back to the Thorpe store?

14    A. Yes, I did.

15    Q. So basically from 1961, when you graduated,

16   to 1965 punctuated by approximately a year of

17   active --

18    A. Six months.

19    Q. -- active duty --

20    A. Yeah.

21    Q. -- you were at the Thorpe store in East

22   Greenwich?

23    A. That's right. I also worked part time at

24   Ivey Apothecary in Providence.

00053

1    Q. You have to tell me that again.

2    A. I worked at I V O R Y Apothecary.  Actually,

3    it's I V E Y, because it was close to Brown

4    University.

5    Q. So this is after you completed active duty?

6    A. Yes.

7    Q. Sometime between '62 and '65 you worked part

8    time at Ivey Pharmacy?

9    A. Yes.

10    Q. This was when you were a pharmacist?

11    A. Yes.

12    Q. So you were filling prescriptions there?

13    A. Yes.

14    Q. How many hours did you work at the Ivey

15    Pharmacy?

16    A. Probably 15 to 20 hours a week.  I was

17    getting ready to get married and wanted some money.

18    And another 40 at Thorpe.

19    Q. You worked 40 hours --

20    A. 40 or 42.

21    Q. At Thorpe?

22    A. Yeah.

23    Q. In 1965 you applied to Lilly to become a

24    sales rep, is that right?

**Cafferty, Philip (8/22/03)**                    **Page 53**

00054

1    A. Yeah.

2    Q. Now, up until 1965 I take it from what you

3    said that you had no experience in any pharmacies

4    outside of the Thorpe Pharmacy and part time at the

5    Ivey Pharmacy, is that right?

6    A. Correct.

7    Q. And you had no experience in any pharmacies

8    in Massachusetts at that point, is that correct?

9    A. Correct. I was not licensed in Massachusetts

10   at that time.

11   Q. Did you become licensed in Massachusetts?

12   A. Yes, I did. I would say probably about 1978

13   when I came back from Florida, the reason being

14   while I was employed by Eli Lilly, even though I was

15   a pharmacist, I did not work part time in the

16   pharmacy. I probably got licensed in Massachusetts

17   in -- 1984 is when I left Lilly, so 1984 is when I

18   became licensed. I could not work part time.

19   Q. I'm sorry. What you are saying is while you

20   worked for Lilly, you worked for Lilly and didn't do

21   any pharmacy work, is that right?

22   A. Correct. It was against company policy.

23   Q. And you believe you were licensed in

24   Massachusetts in about 1984?

00065

1 new drug came out, we would ship a bottle to the

2 pharmacy or whatever a new drug shipment or

3 something like that. Most pharmacies would sign it.

4 If the drug didn't move the first three months, we

5 told them we would take it back, so they had very

6 little invested.

7 Q. Okay. Now, with respect to -- this is 1965

8 when you first started. I take it that you were not

9 detailing DES or diethylstilbestrol --

10 A. No.

11 Q. -- is that right?

12 A. No.

13 Q. Did you have any information about DES or

14 diethylstilbestrol?

15 A. No. I knew Lilly made it. I knew what it

16 was used for, but we never detailed it.

17 Q. Okay.

18 A. I never discussed it with the physician.

19 Q. And in fact, the doctors that you were seeing

20 were not likely OB/GYNs?

21 A. Some were OB/GYNs, but for the most part they

22 were general practitioners and internal medicine.

23 Q. But you didn't discuss DES with them?

24 A. No.

**Cafferty, Philip (8/22/03)**                    **Page 65**

00068

1    A. Correct.

2    Q. And to whom did you call the order in?

3    A. Back then McKesson was the only one.

4 McKesson was the only one in Rhode Island, and in

5 Massachusetts you had Gilman Brothers, Daley. It

6 was Gilman Brothers in Massachusetts, McKesson.

7    Q. So you are saying that those are wholesalers

8 that dealt with Lilly products, is that correct?

9    A. Correct.

10    Q. There were many other wholesalers, were there

11 not?

12    A. Yes. For example, in Rhode Island there was

13 McKesson and Providence Wholesale. Providence

14 Wholesale could not carry the Lilly line because

15 they were a cooperative wholesaler, and Lilly has in

16 their bylaws that they could not sell to a

17 cooperative wholesaler.

18    Q. If a pharmacy in Rhode Island was dealing

19 with Providence Wholesale Drug, they wouldn't be

20 able to get a Lilly product?

21    A. Not until about 1968 or '69, I think, for

22 Providence Wholesale.

23        MR. LEVINE: When you say they ordered

24 their DES from Providence —

**Cafferty, Philip (8/22/03)**                    **Page 68**

00076

1    Q. Your view would be that there would be, you

2  know, 2,500 to 3,700 or so pharmacists in

3  Massachusetts, is that right?

4    A. That's what the numbers are saying, yeah.

5    Q. And having said that, that's what you -- so

6  in 1965 basically from your observation of the

7  territory that you had in around Fall River, your

8  guess would be we are looking at 2,500 to 3,700

9  pharmacists practicing in Massachusetts in '65, is

10  that correct?

11    A. Correct.

12    Q. Now, let's go back to north of Massachusetts.

13  How many internal medicine specialists did you deal

14  with?

15    A. I would say approximately 200.

16    Q. What hospitals did you deal with?

17    A. Salem. Let's see. There was a hospital in

18  Stoneham. It wasn't New England Medical. The

19  Seventh Day Adventist Hospital. I don't recall the

20  name of it. Malden Hospital; Milford Hospital; I

21  guess it was a hospital in Peabody. I think it was

22  St. John's. Just about every town had its own

23  hospital. I would call on all of those hospitals.

24    Q. Okay. And it's clear that you were not

00077

1 detailing DES at that point?

2   A. No, I was not.

3   Q. In fact, Lilly never detailed DES?

4   A. Not while I was employed, no.  Not since 1965

5 on.

6   Q. Okay.  These specialists in internal medicine

7 would not be expected to be prescribing DES, would

8 they?

9   A. No, they did not.

10   Q. So you didn't have any conversation with them

11 about that?

12   A. No.  I never detailed DES at all in my

13 career.

14   Q. Okay.  When you went to the hospitals, you

15 were concerned with the particular drugs you were

16 detailing, is that correct?

17   A. Correct.

18   Q. And you weren't concerned with DES?

19   A. No.  Back then, you know, when I was north of

20 Boston, I was concerned primarily with Keflin and

21 Loridine in the hospitals and the Darvocet or Darvon

22 compound.

23   Q. I didn't hear.

24   A. I was primarily concerned with Keflin,

**Cafferty, Philip (8/22/03)**                **Page 77**

00084

1    A. Yes.

2    Q. And not dealing with any retail pharmacies?

3    A. Right.

4    Q. And in 1971 to '72 you were in Boston not

5    dealing with any retail pharmacies, is that right?

6    A. Correct.

7    Q. I do have a number of questions to ask about

8    this, but I do need to go through some parts of your

9    statement that we marked as Exhibit 1.  Having gone

10   through -- I'm sorry.  We were summing up about

11   where you have been.  Through all of this time up

12   until 1972 you didn't make any notes or observations

13   about, written observations -- I'm sorry -- written

14   observations or notes about diethylstilbestrol?

15   A. Correct.

16   Q. And that was not a focus of your interest, is

17   that right?

18   A. No.

19   Q. In fact, it's something you didn't pay any

20   attention to at all, is that correct?

21   A. Correct.  We were not detailing it.

22   Q. So let's turn to your statement, Exhibit 1.

23   Now, first of all, would you say that this statement

24   of Philip Cafferty, would you say these are in your

**Cafferty, Philip (8/22/03)**                    **Page 84**

00105

1    A. Correct.

2    Q. That's the sole basis on which you say it's a

3 98 percent certainty?

4    A. Right.

5        MR. LEVINE:  I don't think he told you

6 about the statements from other pharmacists.

7    Q. Did you help to get those statements from

8 other pharmacists?

9    A. The 200 that I have, but Aaron has some

10 statements in his office.

11   Q. And those are ones you looked at?

12   A. Yes.

13   Q. You treated each of those statements as if

14 they were accurate?

15   A. Absolutely.

16   Q. And you assumed they were reliable and you

17 could base your conclusions on those?

18   A. Yes, I did.

19   Q. What, if anything, did you do to satisfy

20 yourself that those statements did reflect the

21 accurate recollection of the pharmacists involved?

22   A. I have certainly put my trust and faith in

23 Aaron Levine's judgment.  He has good judgment.

24   Q. What, if anything, have you done to determine

00106

1  whether the memories of these pharmacists as

2  reflected in those statements actually reflect

3  what the purchasing or prescribing practices were

4  back in the fifties and sixties?

5      A. I have done nothing.

6      Q. You just relied on the statements?

7      A. Correct.

8      Q. Those came to you from Mr. Levine?

9      A. Correct.

10     Q. Mr. Cafferty, are you aware of any efforts

11  that experts, courts and experts have done to try

12  and determine --

13     A. Who?

14     Q. Courts and experts have done to try and find

15  out about the relative share of the market that

16  different companies had in DES?

17     A. No, I am not.

18     Q. Okay. Are you aware that there was a trial

19  about the relative market shares of DES that was

20  conducted in California?

21     A. No, I am not.

22     Q. You didn't review any of the material there?

23     A. No.

24     Q. And if, in fact, it turned out that the

**Cafferty, Philip (8/22/03)**                    **Page 106**