UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

JULIE DELANEY and
WILLIAM P. DELANEY

         Plaintiffs,

         v.

ELI LILLY AND COMPANY,

         Defendant.

CIVIL ACTION No. 05-CV-10241 (MLW)

### DEFENDANT ELI LILLY AND COMPANY'S
### MOTION TO STRIKE AFFIDAVIT OF HAROLD SPARR, R.PH.

In their Opposition to Lilly's Motion for Summary Judgment ("Plaintiffs' Opposition"), plaintiffs Julie and William Delaney rely on an affidavit submitted by Harold Sparr, R.Ph. in an attempt to satisfy their burden of proving that Lilly's diethylstilbestrol caused Mrs. Delaney's alleged anatomical injuries. The Sparr Affidavit is incompetent under Rule 56(e) because Mr. Sparr cannot establish a basis in personal knowledge for his assertions that Boston/Hingham pharmacies carried Lilly's diethylstilbestrol exclusively and that only Lilly's diethylstilbestrol fits the pill description provided by Mrs. Delaney's mother. In addition, Mr. Sparr's assertions about the Red and Blue Books should be stricken because they contradict his prior sworn deposition testimony.

    A.    **THE SPARR AFFIDAVIT MUST BE EXCLUDED AS SPECULATIVE AND CONTRADICTORY**

The objectionable portions of the Sparr Affidavit break down to three basic assertions: (1) drugstores in Hingham, Massachusetts stocked Lilly's DES exclusively, Sparr Affidavit, Docket No. 45, App. 7, ¶ 7; (2) only Lilly marketed a white cross-scored diethylstilbestrol pill in 1969-'70, *id.* ¶ 8; and (3) only a few of the manufacturers listed in the Red and Blue Books were

B3021947.1

national pharmaceutical distributors whose products were available in Boston, Massachusetts, *id.* ¶¶ 10, 11. Each of these assertions must be stricken as either speculative or contradictory.

        1.      <u>Mr. Sparr's Assertions that Drugstores in Hingham Stocked Lilly's DES Exclusively is Rank Speculation</u>

A recent deposition of Mr. Sparr revealed that has no personal knowledge of the stocking and dispensing practices of drugstores in Hingham, Massachusetts. Mr. Sparr has never worked in a pharmacy in Hingham, Massachusetts. *Id.* ¶ 3. He does not claim to have ever visited a pharmacy in Hingham. Mr. Sparr has never reviewed any purchasing or prescription records from any pharmacy in Hingham. Transcript of Deposition of Harold Sparr ("Sparr Tr. II"), at 7, 27, 74-75 (attached as Ex. 1 to Supplemental Affidavit of Brian L. Henninger in Support of Summary Judgment ("Supp. Aff."), Docket No. 50). Mr. Sparr does not know which wholesalers, if any, were used by the pharmacies in Hingham.[1] *Id.* at 73-74. In short, there is nothing in Mr. Sparr's affidavit making it more likely than not that the Hingham Pharmacy stocked Lilly's DES as opposed to one of the other 60 brands of DES on the market in 1969-'70.

At deposition, Mr. Sparr made clear that the only information he had about the stocking and dispensing practices of pharmacies in Hingham came from a single, non-contemporaneous, hearsay conversation with two pharmacists who owned an unidentified pharmacy. Specifically, Mr. Sparr testified that the two pharmacists -- Arnold Shapiro and Lloyd Scholler -- owned an unidentified pharmacy in Hingham, that they recalled Lilly being "the Cadillac of the industry"

---

[1] Moreover, Mr. Sparr's statement that "Lilly DES was exclusively ubiquitous in the Boston/Hingham area" is demonstrably false; the Hingham Centre Pharmacy, which is distinct from the Hingham Pharmacy that Ms. Delaney's mother identified as the dispensing pharmacy, carried DES manufactured by Squibb, Burroughs-Wellcome and Lilly in the 1960's. *See* Transcript of Deposition of George Whiton Price in *Lee v. Abbot Labs*, Civil Action No. 768299 (Cal. Sup. Ct.), dated July 29, 1983 ("Price Tr."), at 44 (attached as Ex. 2 to Supp. Aff., Docket No. 50). This information was not disclosed to plaintiffs during discovery because (a) it was irrelevant to the stocking and dispensing practices of the Hingham Pharmacy, and (b) Lilly did not know that Mr. Sparr would claim knowledge of the stocking and dispensing practices of the pharmacies in Hingham generally until his affidavit was filed with Plaintiffs' Opposition.

in the 50's, 60's and 70's, and that they "*probably* stocked the Eli Lilly." Sparr Tr. II, at 29 (emphasis added) (Supp. Aff., Ex. 1, Docket No. 50). Mr. Sparr's conversation with these pharmacists, and any statement based thereon, constitute inadmissible double hearsay that should not be considered on summary judgment. *Apex Constr. Co., Inc. v. U.S*, 719 F.Supp. 1144, 1151 (D. Mass. 1989) (excluding affidavit under Rule 56(e) because affiant lacked a basis on personal knowledge for affidavit's content other than hearsay that would be inadmissible at trial); *Garside v. Osco Drug, Inc.*, 895 F.2d 46, 49 (1st Cir. 1990) (excluding plaintiff's expert interrogatory responses from consideration on summary judgment because plaintiff's hearsay conversations with their expert could not provide them with sufficient personal knowledge under Rule 56(e)).

Setting aside the hearsay issue, the content of Mr. Sparr's conversation with these pharmacists does not make it more likely than not that Lilly's DES was generally dispensed in Hingham. First, according to Mr. Sparr, these pharmacists co-owned only *one* of six pharmacies located in Hingham. Sparr Tr. II, at 28, 30 (Supp. Aff., Ex. 1, Docket No. 50). The stocking and dispensing practices of *one* pharmacy in Hingham does not fairly represent the stocking and dispensing practices of *all* the pharmacies in Hingham. Second, Mr. Sparr could not recall *which* pharmacy in Hingham Mr. Shapiro and Mr. Scholler owned. *Id.* at 31. Third, Mr. Sparr did not say *when* Mr. Shapiro and Mr. Scholler owned their pharmacy in Hingham. *Id.* at 29-32. DES was dispensed by pharmacies long after 1971 for indications other than pregnancy; if Messrs. Shapiro and Scholler owned their pharmacy after 1971, then their preferred brand of DES is irrelevant to this lawsuit. Fourth, neither Mr. Shapiro nor Mr. Scholler were willing to sign a statement indicating that their pharmacy exclusively stocked Lilly's DES. *Id.* at 30. Their reluctance to identify Lilly without independent corroboration highlights the unreliability of their hearsay statements.

Under Rule 56(e), affidavits used to oppose a summary judgment motion must be based on personal knowledge rather than speculation or hearsay. Mr. Sparr's affidavit fails each facet of Rule 56(e) and must be excluded from the Court's consideration.

### 2. Mr. Sparr's Assertion that Lilly Alone Marketed A White Cross-Scored Pill in 1969-70 is Likewise Rank Speculation

Mr. Sparr has no personal knowledge that Lilly was the only manufacturer marketing a diethylstilbestrol pill that fit the description of Ms. Delaney's mother. He admits that he has never seen any DES pill other than Lilly's. Sparr Tr. II, at 17, 45-46 (Supp. Aff., Ex. 1, Docket No. 50). His "knowledge" about the uniqueness of Lilly's white, cross-scored pill is based on a review of a single photograph of that pill, *id.* at 8-9, 16, a review of Lilly's product literature that contained no photograph or description of the pill, *id.* at 18, and a review of the Physician's Desk Reference for 1969-'70 which contained no photograph or description of the pill, *see id.* at 19; *see e.g.* 1969 Physician Desk Reference (Docket No. 45, App. 20) (showing no description or photograph of Lilly's DES pills). Mr. Sparr not only admitted that he could not say one way or the other if Squibb's DES pill fit the pill description at issue in this case, *id.* at 16, he also admitted that he *could not say* that *none* of the other DES pills marketed by the manufacturers listed in the Red and Blue Books were white and cross-scored, *id.* at 57. Finally, Mr. Sparr acknowledged that he did *nothing* to verify his statement that Lilly's white, cross-scored pill was unique in the DES market; he did not look at pictures of other pills, *id.* at 8-9, 16, nor did he consult any medical or pharmacy journals to substantiate his bold claim, *id.* at 47.[2] Mr. Sparr's statement that cross-scoring was unique to Lilly's DES pill is pure speculation that deserves no

---

[2] Mr. Sparr specifically acknowledged that because he has no experience in manufacturing pills, he "wouldn't know" whether it was feasible for the DES manufacturer's listed in the Red and Blue Books to produce a cross-scored DES tablet. *Id.* at 52-53.

credence from this Court. Mr. Sparr simply could not say whether DES manufacturers other than Lilly and Squibb made DES pills that fit the description provided by Ms. Delaney's mother.

> 3. Mr. Sparr's Assertions Regarding the Scope and Purpose of the Red and Blue Books Should Be Excluded as Contradictory

Mr. Sparr's assertion that only a few of the manufacturers listed in the Red and Blue Books were national pharmaceutical distributors whose products were available in Boston directly contradicts his sworn deposition testimony in prior DES litigation. Mr. Sparr testified as follows about the import of the Red and Blue Books:

> Q. Could you tell us, please, what the Red Book is, please?
> A. It's a publication that includes all the different brands of all the drugs that were available with their cost.
> Q. And the Red Book, I take it, is called the Drug Topics Red Book; is that correct?
> A. Yes.
> Q. And this is a publication that went to all pharmacists; is that correct?
> A. As far as I know, yes. We used to receive it every year.
> Q. And this list was a list of drugs that were available for purchase by any of those pharmacists; is that correct?
> A. That's correct.
> Q. So these were drugs that were available in the national supply chain to be purchased; is that correct?
> A. That's correct.
> . . .
> Q. And there was also something called a Blue Book; is that right?
> A. That's correct.
> Q. And this is called, the American Druggist's Blue Book; is that right?
> A. That's right
> . . .
> Q. And was this also, sir, a publication that went to all pharmacists?
> A. Yes.
> Q. And this was a publication that listed drugs that were available to purchase on a national basis; is that right?
> A. Yes.
> Q. So any pharmacist could buy any drug that was listed in the Blue Book or the Red Book; is that correct?
> A. Providing that the wholesaler had it.

      Q.  But these were the ones that were available; is that right?
      A.  That's correct. They wouldn't list drugs that weren't available.
      Q.  Right.

*See* Transcript of Deposition of Harold Sparr in *Bohlin v. Eli Lilly and Company*, Civil Action No. 03-CV-11577 (MEL) ("Sparr Tr.") 101-03 (attached hereto as Ex. 1). Plaintiffs cannot rely on Mr. Sparr's contradictory affidavit testimony to ward off summary judgment. *Colantuoni v. Alfred Calcagni & Sons, Inc.*, 44 F.3d 1, 4-5 (1st Cir. 1994) (stating that "[w]hen an interested witness has given clear answers to unambiguous questions, he cannot create a conflict and resist summary judgment with an affidavit that is clearly contradictory, but does not give a satisfactory explanation of why the testimony is changed").

## CONCLUSION

For all the foregoing reasons, Lilly respectfully requests that the Sparr Affidavit be excluded from consideration on summary judgment because it does not comport with the requirements of Fed. R. Civ. P. 56(e).

## REQUEST FOR ORAL ARGUMENT

Pursuant to L.R. 7.1, Lilly hereby requests a hearing on this motion.

                                              Respectfully submitted,

                                              FOLEY HOAG LLP

                                              /s/ Brian L. Henninger
                                              James J. Dillon (BBO # 124660)
                                              Brian L. Henninger (BBO # 657926)
                                              FOLEY HOAG LLP
                                              155 Seaport Boulevard
                                              Boston, MA 02111-2600
                                              (617) 832-1000

Dated: November 20, 2006

## LOCAL RULE 7.1(A)(2) CONFERRAL CERTIFICATION

  I, Brian L. Henninger certify that on November 20, 2006, I conferred with Plaintiffs' counsel regarding Lilly's Motion to Strike Statement of Harold Sparr. Plaintiffs' counsel does not consent to the Motion.

                 /s/ Brian L. Henninger

**Ex. 1**

1

1         VOLUME  I

2         PAGES   1 - 237

3         EXHIBITS  Per Index

4

5     UNITED STATES DISTRICT COURT

6       DISTRICT OF MASSACHUSETTS

7 ------------------------------x

8 NANCY A. BOHLIN, INDIVIDUALLY,

9 AND AS MOTHER AND NEXT FRIEND OF

10 SAMANTHA A. BOHLIN, A MINOR,    Civil Action

11     Plaintiff         No. 03-CV-11577

12   v.              (MEL)

13 ELI LILLY AND COMPANY,

14     Defendant

15 ------------------------------x

16

17     DEPOSITION OF HAROLD B. SPARR

18       Tuesday, December 7, 2004

19         Foley Hoag, LLP

20         155 Seaport Boulevard

21         Boston, Massachusetts

22

23     REPORTER:  Virginia L. Barry, RPR/CSR

24

1  Q. Did you make any effort to remind people
2  that they had to think back, and that they couldn't
3  just take their memories from 1972, from the '70s
4  and the '80s and the '90s, and the early part of
5  this century, and apply that back; did you do any --
6  A. Absolutely not.
7  Q. So you did nothing to try and help them to
8  focus their memory on the '50s and '60s; is that
9  correct?
10  A. I asked them if they remembered what brand
11  of diethylstilbestrol they dispensed.
12  Q. Do I recall, am I correct in my assumption
13  that a pharmacist would not know the purpose for
14  which a doctor wrote a script, the effect that the
15  doctor wanted to have, he would simply know that
16  this drug and strength was prescribed, and to fill
17  it; is that correct?
18  A. That's correct.
19  Q. Now, Mr. Sparr, in your report you made
20  mention of The Red Book and The Blue Book; do you
21  remember mentioning that in your report?
22  A. Yes.
23  Q. Could you tell us, please, what The Red
24  Book is, please?

**Sparr, Harold (12/7/04)**                                **Page 101**

1    A.   It's a publication that includes all the

2  different brands of all the drugs that were

3  available with their cost.

4    Q.   And The Red Book, I take it, is called The

5  Drug Topics Red Book; is that correct?

6    A.   Yes.

7    Q.   And this is a publication that went to all

8  pharmacists; is that correct?

9    A.   As far as I know, yes.  We used to receive

10  it every year.

11    Q.   And this list was a list of drugs that

12  were available for purchase by any of those

13  pharmacists; is that correct?

14    A.   That's correct.

15    Q.   So these were drugs that were available in

16  the national supply chain to be purchased; is that

17  correct?

18    A.   That's correct.

19    Q.   And I believe you told me that The Drug

20  Topics Red Book came out every year; is that right?

21    A.   That's correct.

22    Q.   And there was also something called a Blue

23  Book; is that right?

24    A.   That's correct.

103

1  Q. And this is called, The American
2  Druggist's Blue Book; is that right?
3  A. That's right, I'm assuming it is.
4  Q. Let me show you a photocopy of this.
5  A. Yes.
6  Q. The American Druggist's Blue Book?
7  A. Yes.
8  Q. And was this also, sir, a publication that
9  went to all pharmacists?
10 A. Yes.
11 Q. And this was a publication that listed
12 drugs that were available to purchase on a national
13 basis; is that right?
14 A. Yes.
15 Q. So any pharmacist could buy any drug that
16 was listed in The Blue Book or The Red Book; is that
17 correct?
18 A. Providing that the wholesaler had it.
19 Q. But these were the ones that were
20 available; is that right?
21 A. That's correct. They wouldn't list drugs
22 that weren't available.
23 Q. Right.
24    MR. LEVINE: How do you know?d (12/7/04)                Page 103