IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JULIE DELANEY and<br>WILLIAM P. DELANEY<br><br>       Plaintiffs,<br>       v.<br><br>ELI LILLY AND COMPANY,<br><br>       Defendant. | Civil Action No. 05-CV-10241 (MLW) |

## PLAINTIFFS' OPPOSITION TO DEFENDANT ELI LILLY'S
## MOTION TO STRIKE THE STATEMENT OF HAROLD SPARR, R. Ph.

**COME NOW** the Plaintiffs and oppose Defendant Eli Lilly and Company's Motion To

Strike the Statement or Testimony of Harold B. Sparr, R. Ph., M.S., and as grounds therefore

states:

## I.     INTRODUCTION

As part of the Plaintiffs' burden in seeking compensation, Plaintiffs must identify the

brand of DES ingested. Due to the passage of time, records have been destroyed. Thus, of

necessity, Plaintiffs' burden of proof must be approached through a multifaceted and innovative

inquiry. While no single document or testimony may be, of itself, sufficient to overcome

Plaintiffs' burden of proof, the Sparr statement, when placed in the context of the mother's

testimony, the PDR evidence and other evidence, the cumulative effect can reach the threshold of

proof.

> It is enough if the item could reasonably show that a fact is slightly
> more probable than it would appear without that evidence. Even
> after the probative force of the evidence is spent, the proposition
> for which it is offered still can seem quite improbable. Thus, the
> common objection that the inference for which the fact is offered

> "does not necessarily follow" is untenable. It poses a standard of conclusiveness that very few single items of circumstantial evidence ever could meet. A brick is not a wall.

Edward W. Clearly, et al., <u>McCormick on Evidence</u> § 185, at 542-43 (3rd ed. 1984). There are no books or articles written and no courses taught on the subject of 25 mg DES usage in Hingham, Massachusetts thirty-five years ago. Plaintiffs must lay one brick after another to make the wall of proof they need to prove: "it is more likely than not that it was the Lilly brand."

Here, Mr. and Mrs. Delaney have pulled from every available source of information and put together a wall of the available clues of which Pharmacist Sparr is an integral part. The Sparr affidavit indicates that the Lilly brand was provided in the overwhelming number of unspecified prescriptions in Massachusetts and therefore makes it much more likely than not that Julie Delaney would have been exposed to Lilly's DES. By itself the Sparr Statement may not be enough for a prima facie case, but its value as an integral part of an evidentiary patchwork renders it relevant to Plaintiffs' claim.

Harold Sparr's opinion is based both upon his many years of experience in the retail pharmacy industry and his own research. The study upon which a part of his expert opinion is based was scientifically conducted, strictly adhering to survey guidelines in published scientific texts. <u>See</u> Report of Hannelore Vanderschmidt, Ph. D., App. 2.[1] An eminent researcher and professor at the Boston University approved the study and analyzed the results to ensure they were free from bias and to ensure that the statistical tests were properly conducted. The questionnaires were approved, distributed and collected by disinterested, academic parties.

Defendant portrays the Sparr study and statements as a ruse created by the Plaintiffs' counsel. This is simply untrue. Over the three decades during which DES victims have pursued

---

[1] All cites to Appendices herein refer to appendices to Affidavit of Aaron M. Levine, Esq. Regarding Authentication of Documents, filed herewith.

DES manufacturers, Plaintiffs' law firm has sued not only Eli Lilly, but also Squibb, Merck, Upjohn, Premo, and dozens of other DES manufacturers. Where it appeared that non-Lilly brands were involved, those particular manufacturers were pursued exclusively. Where the mother could not remember the pill that she took, or witnesses were dead and the particular jurisdiction did not allowed market share liability, cases were rejected. See Affidavit of Aaron M. Levine, App. 3. If in the hundreds of DES cases managed by its legal counsel Lilly could discern any pattern or strategy of chicanery, they would have exposed it by now.

Harold Sparr is a pharmacy expert and based his opinions on an unbiased, scientific study. His observations and his opinions are reliable. Because his expert opinion together with a myriad of other facts helps establish that more probably than not Julie Delaney was exposed to DES manufactured by Eli Lilly, it is relevant.

## II. DEFENDANT'S OBJECTIONS CONCERNING PHARMACIST SPARR'S RELIABILITY SHOULD BE PROPERLY BROUGHT AND EVALUATED BEFORE THIS COURT AT A FEDERAL RULES OF EVIDENCE 104(A) AND 104(C) HEARING

Federal Rules of Evidence 104(a) and 104(c) (hereinafter Rule 104(a), (c)) provide for a hearing on a Daubert motion. It is defendant's burden to request such a hearing before Mr. Sparr is disqualified from giving testimony in a case.

A hearing is especially relevant in the summary judgment context, as courts have ruled that, in general, expert witnesses are not to be stricken on a motion for summary judgment except in the most clear-cut of cases. As the First Circuit has established in Cortes-Irizarry v. Corporacion Insular, 111 F.3d 184 (1st Cir. 1997):

> A trial setting normally will provide the best operating environment for the triage which *Daubert* demands. *Voir dire* is an extremely helpful device in evaluating proffered expert testimony ..., and this device is **not readily available in the course of summary judgment** proceedings. Moreover, given the complex factual inquiry required by *Daubert,* courts will be hard-pressed in all but the most clear-

3

cut cases to gauge the reliability of expert proof on a truncated record. Because the summary judgment process does not conform well to the discipline that *Daubert* imposes, the **Daubert regime should be employed only with great care and circumspection at the summary judgment stage**.

We conclude, therefore, that at the junction where *Daubert* intersects with **summary judgment practice, *Daubert* is accessible, but courts must be cautious**-- except when defects are obvious on the face of a proffer--not to exclude debatable scientific evidence without affording the proponent of the evidence adequate opportunity to defend its admissibility.

111 F.3d at 188 (emphasis added). Harold Sparr has 40 years of experience in retail pharmacy. He has conducted literature reviews, research, and surveyed pharmacists in Massachusetts on their stocking and prescription-filling habits. See Sparr Affidavit, App. 1. Plaintiffs should at least be allowed to present, to the Court's consideration, the merits of Harold Sparr's qualifications and expertise.

## III.     PHARMACIST HAROLD SPARR'S STATEMENT IS RELIABLE PURSUANT TO FEDERAL RULE OF EVIDENCE 702, <u>DAUBERT</u> AND ITS PROGENY

As stated in <u>Kumho Tire</u>, "the test of reliability is 'flexible,' and Daubert's list of specific factors neither necessarily nor exclusively applies to all experts or in every case." <u>Kumho Tire Co., Ltd. v. Carmichael</u>, 526 U.S. 137, 141 (1999). Given that the Rules are "flexible" and "liberal" in their application, heavily biased towards admitting relevant testimony, expert Pharmacist Harold Sparr's statement is admissible. <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u>, 509 U.S. 579 (1993) (noting the "liberal thrust" of the Federal Rules and their "general approach of relaxing the traditional barriers to 'opinion' testimony"), <u>citing</u> <u>Beech Aircraft Corp. v. Rainey</u>, 488 U.S. 153, 169 (1988); <u>see also</u> Weinstein, <u>Rule 702 of the Federal Rules of Evidence is Sound; It Should Not Be Amended</u>, 138 F.R.D. 631 (1991).

## A. Mr. Sparr Is Qualified As an Expert

The Defendant grossly mischaracterizes Mr. Sparr's background. Lilly attempts to cast him as a mere pill dispenser who never left the back of a store. If anyone is familiar with the customs and practices of the Boston retail pharmacy milieu back then, and qualified to form expert opinions involving dispensation practices in retail pharmacy in the Boston area, it is Mr. Harold B. Sparr, R. Ph., M.S. His education, training, experience, and data relied upon include:

- Serving as the President of Massachusetts Board of Registration of Pharmacy.

- Serving as the President of Massachusetts College of Pharmacy Alumni Association.

- Beginning his retail pharmacy career in 1944 as a clerk in his father's store.

- Working as a retail pharmacist "continuously and exclusively until the present," after gradating pharmacy school in 1951.

- Holding a Bachelor of Science from Massachusetts College of Pharmacy, licensed in Massachusetts, New York, and California in Pharmacy, and holding a Masters Degree in Health Care Management.

- Conducting an extensive literature search of the pertinent retail pharmaceutical literature.

- Reviewing and personally observing Massachusetts retail drug store practices and the DES environment from 1954-1971.

- Visiting hundreds of Boston area pharmacies and talking to hundreds of pharmacists familiar with the drug stocking practices in the region.

- Teaching for 5 semesters as an Adjunct at the Massachusetts College of Pharmacy.

- Teaching at Northeastern University for 13 years about Pharmacy Practice.

See Sparr Affidavit, App. 1.

Who better to help design and interpret a study of Massachusetts pharmacists than a retail pharmacist, acting in accordance with an esteemed epidemiologist and statistician, with decades

of experience in and around the Boston area; a man who is also the president of several Boston pharmacists' associations, and who personally visited innumerable Massachusetts pharmacies and spoke with pharmacists throughout the state?  Pharmacist Sparr's conclusions were based on six research areas including:

1)   Mr. Sparr's personal experience as a retail pharmacist and as the president of pharmacy associations,

2)   a literature search of pertinent pharmacy and retail pharmaceutical literature,

3)   a review of Massachusetts retail drug store practices and the DES marketing environment from 1954-1971,

4)   the Boston University survey study,

5)   Lilly's own records, and

6)   the affidavits of hundreds of pharmacists in Boston.

See Sparr Report, App. 4.

Pharmacist Sparr need not be an expert market researcher.  Fed. R. Evid. 702; see also Tuf Racing Prods., Inc. v. American Suzuki Motor Corp., 223 F.3d 585, 591 (7th Cir. 2000) (holding that The Federal Rules of Evidence ... do not require that expert witnesses be academics or PhDs, or that their testimony be "scientific" in character).  Mr. Sparr is not testifying to the general practice of market research. He is not testifying on the best practices of study design, nor is Mr. Sparr testifying as a statistician.  He is testifying that, from his training, observations, knowledge, and experience, in addition to the survey data, the general practice of pharmacies in Massachusetts in the 1960's was to fill unspecified orders of DES with the Lilly brand, and that, in fact, over 90 percent of the time a Lilly product was supplied in these circumstances.  If Mr. Sparr, an eminent pharmacist of forty-nine (49) years who has done a

literature search, talked to hundreds of pharmacists, reviewed data, been President of local pharmacy associations, and lectured on pharmacy practice is not qualified to make this sort of statement, who is?  Lilly provided no contradictory expert.

**B.     The Survey Upon Which Mr. Sparr Relies is Reliable**

1. The Survey Meets the Factors Laid Out in Daubert

In Daubert v. Merrel Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993), the Supreme Court determined that it was a trial judge's duty to serve as a "gatekeeper" to exclude evidence that was both unreliable and irrelevant from the courtroom.  Id. at 589 n.7, 597; see also Prado Alvarez v. R.J. Reynolds Tobacco Co., 405 F.3d 36, 40 (1st Cir. 2005) (holding that the court must exercise a gatekeeping function to assess preferred expert testimony).  The Daubert Court set out several factors that went to the reliability of scientific evidence which included,

> (1) whether the opinion can be or has been tested; (2) whether the theory of technique on which the opinion is based has been subjected to peer review and publication; (3) the technique's known or potential error rate; (4) the existence and maintenance of standards controlling the technique's operations; and (5) "general acceptance."

Daubert, 509 U.S. at 593-594; see also United States v. Mooney, 315 F.3d 54 (1st Cir. 2002). The Boston University survey can be tested.  Indeed, if another researcher chose to replicate the Boston University study, he or she certainly could.  The study has been laid out in adequate detail, with the survey forms and statistical methods detailed in Dr. Vanderschmit's report. See Report of Hannelore Vanderschmidt, Ph.D., App. 2. Surveys, as a technique of gaining scientific knowledge, are a generally accepted method of doing research.  Survey error rates vary, but tend to be well within accepted limits.  The statistical variation in this study had an error rate of +/- 6 percentage points.  If Lilly thought the study flawed, they could have replicated it to show that there was a different result.

The study was crafted to maintain standards as to the survey's operation. The questions were designed to be non-leading, being open-ended so as not to falsely mislead pharmacists into choosing an incorrect brand. The study was divided so as to have different researchers conducting the different phases of the study. No individual researcher could have impermissibly bias the study. The data were collected by an outside, disinterested survey agency and processed by a neutral third party: Dr. Vanderschmidt.

Defendant claims that the sample size was too small to adequately represent all pharmacists in Massachusetts. This is false. The sample was well within accepted limits, exceeding the sample sizes for other studies. See "Reference Guide on Survey Research", Reference Manual on Scientific Evidence, 2d ed., (Fern M. Smith ed., Federal Judicial Center 2000, pp. 229-271). Indeed, Eli Lilly itself considers breast cancer studies with no more than 54 participants, for the eventual benefit of the 21 *million* women who are affected by breast cancer! See A Phase II Study of a Combination of Pemetrexed and Gemcitabin in Patients with Metastic Breast Cancer: An NCCTG Study (59 participants, uncontrolled, non-randomized study when 1 in 7 women, or about 20,500,000 women are affected by breast cancer) available at http://www.lillytrials.com/results_files/alimta/alimta_summary_2245.pdf, see App. 5. Plaintiffs' 79 participants to represent 5,000 pharmacists carries greater statistical weight.

Defendant charges that the sample chosen was not random, which is only marginally true. While a completely random sample may be the ideal, it is often not possible, and designers need only be as random as they are able to ensure the validity of their findings. A qualified epidemiologist, who gave her stamp of approval, designed the Boston University study. Those who were asked to complete it would: (a) have the relevant knowledge, (b) remember the relevant knowledge, (c) have contact information, and (d) be representative of community

8

pharmacists in Massachusetts. To ensure that the pharmacists had the relevant knowledge, it was necessary to choose from pharmacists that had practiced at the relevant times – in the 1960s when the prescription of DES was at its highest point. The pharmacists had to be licensed in Massachusetts. To this end, the study's designers chose pharmacists who were initially licensed in the 1960s. Second, the study's design sought to ensure that the participants were both alive and able to remember the relevant time period.

Third, the studies designer's chose pharmacists who were initially licensed to practice in Massachusetts between the years of 1963-1967 because they were accessible. The names and contact information for the pharmacists licensed in initial years were available from the Massachusetts government for those initially licensed. A survey is useless if one has no way to send it out. An imperfect sample does not make the study invalid, but rather is a factor when calculating the rate of error and assessing the relative weight the study should be given. Finally, the pharmacists chosen were meant to be representative of pharmacists generally in Massachusetts by having graduated from pharmacy school in each of three decades the 1940's, 1950's and 1960's. The pharmacists were scattered all over the state of Massachusetts. As a final note, Dr. Vanderschmidt, an eminent researcher and author of several published survey studies, reviewed the sampling criteria established in this study and proclaimed it to be valid and sound:

> The number of possible responders was properly surveyed to obtain a representative sample…. The study and its results meet or surpass the assignment I undertook as contained in a letter to you from an attorney who I understand represents DES daughters seeking compensation from manufacturers… However, neither this attorney, nor anyone else engaged in such litigation nor any of the claimants have played any role in the design or conduct of this survey or my conclusions… This study is adequately free from any bias that could invalidate the results. [Emphasis added]

See Vanderschmidt Report, p. 4, App. 2.

At this stage in the proceeding, Plaintiffs are entitled to every favorable inference, and so Dr. Vanderschmidt is entitled to be believed.

Furthermore, the study confirms generally accepted beliefs. It is generally accepted and believed by dozens of pharmacists that Eli Lilly and Company had a majority of the market share for DES in the 1960s. It is true that the results from the study have not been published. However, the availability of the diethylstilbestrol in the pharmaceutical market in Boston from 1955 to 1971 is such an obscure and unique topic that it would have been unlikely for such a study to emerge in academics, medicine, or social sciences from independent sources. In fact the only entity that has this information is Defendant Lilly and they have refused to disclose it. Every study need not be published to be admissible in court. See Daubert, 509 U.S. at 593 (holding that publication is not a *sine qua non* of admissibility). It is enough that the study satisfies the first four prongs of the Daubert test. There is no publication in print that would consider publishing a study of how many pharmacies in the 1960's prescribed the Lilly brand of DES.

    2. Plaintiffs' Counsel Did Not Design the Study

Defendant seeks to paint the study as bought and paid for by Plaintiffs' counsel, thus tainting Mr. Sparr's testimony, but this is not the case. The study was designed by the Department of Epidemiology of the Boston University. Plaintiffs' counsel merely formalized and organized the Department's recommendations in a letter. A meeting was held at the Boston University with Dr. Vanderschmidt, Pharmacist Steere (from Remedy Pharmacy Management Services), Pharmacist Sparr, and Plaintiffs' counsel to determine if the market share of DES brands could be adequately established by a survey and, if so, what the design should be. Dr.

Vanderschmidt, Mr. Sparr and Mr. Steer designed the study to ensure objective standards.  See Report of Hannelore Vanderschmidt, Ph.D., App. 2.

### 3. The Boston University Survey Answers the Question Mr. Sparr Asked

Defendant argues that the study is inadequate to aid Mr. Sparr in forming his expert opinion because the study asks a different question from that which defendant seems to find relevant.  Defendant suggests that the relevant question is "what brand of DES did each pharmacy stock?" (See Def. Mem. at 7.)  This is not the relevant question.  However, Mr. Sparr was not interested in that question.  The relevant question was: "what brand would have been primarily dispensed to patients when the prescribing physician specified no brand?"  This is precisely the question asked by the survey.

The study was not interested in those times in which the brand name was specified; of course the brand specified would have been dispensed in those circumstances, to do otherwise would have been contrary to the ethical practice of pharmacy.  The designers of the Boston University study were entitled to choose their own question to answer in a valid and scientific way, rather than have the question be re-categorized or altered by a future defendant in litigation.

According to a pharmacist in Hingham, Massachusetts deposed by Eli Lilly over twenty years ago, the majority of prescriptions for DES in Hingham did not specify the manufacturer.  Deposition of George Price 82-83, at App. 6.  Therefore, regarding Hingham, the study accurately reflects the nature of the market for DES.

The question Sparr asked is especially relevant in the present case, as Plaintiff Julie Delaney's mother's prescription was for "stilbestrol" without a manufacturer's trade name. (See Barbara O'Leary's Medical Records, attached to Dep. of Philip G. Sullivan, M.D. as App. 14 to Pls.' Opp'n to Def.'s Mot. for Summ. J, Docket No. 45.)  In a town where most DES

11

prescriptions, including Mrs. Delaney's mother's, did not specify the manufacturer, a study showing what drugs were prescribed for unspecified prescriptions should be considered the best way, in the absence of other evidence, to provide evidence of what drug Mrs. Delaney's mother took.

Secondly, the Defendant argues that the survey may have included not only DES dispensed specifically for pregnancy use, but any 5mg or 25mg prescriptions bearing "DES", "Stilbestrol", or "Diethylstilbestrol." (See Def. Mem. at 7.) If such oversight occurred, however, it would only mean the survey could have been over-inclusive rather than under-inclusive, which is an asset rather than a flaw. That is, if the responding pharmacist neglected to limit his answer to only DES for pregnancy use as specifically solicited by the survey, but included DES dispensed for whatever ailments, that means the results speak to all uses including pregnancy use. This does not change the fact that the predominant brand dispensed for non-designated prescriptions, for pregnancy and perhaps other problems, is still Lilly. Moreover, the survey result was based on careful statistical analysis to preclude error and determine statistical significance. See Sparr Report, App. 4; Vanderschmidt Report, p. 2, App. 2. Thus, the result of the survey question is more than adequate to cover the non-designated prescription, brand identification issue at bar.

### 4. The Boston University Study was Designed to Elicit Accurate Memories

First, Defendant charges that no protections were put in place to protect against the failing memories of the aged respondents to the survey. This is untrue. The memory issue was specifically addressed here by choosing pharmacists still practicing, thus leading to the conclusion that they would still have good memories.

Second, the defendant makes it appear necessary to cross-examine every survey respondent, and canvas their long-gone pharmacy records from 40 years ago in order for the survey results to be valid. None of the statistics or survey sampling authorities support that view. See "Reference Guide on Survey Research," Reference Manual on Scientific Evidence, 2d ed., (Fern M. Smith ed., Federal Judicial Center 2000, pp. 229-271). Those conducting political surveys, for example, do not run around after people to see what they really think, or really do.

Defendant's proposed "memory test" standard is not only unreasonable and unrealistic, but also contrary to survey standards. See id. The only remaining records of actual sales of DES are held by the Defendant and held by the survey responder's memories. Because the Defendant has not seen fit to volunteer its hard records, the study's designers chose to question pharmacists instead. As Mr. Sparr simply put at his deposition, if the pharmacist cannot remember, he cannot answer the survey. See Sparr Dep., T161:5-10, Def. Mem. Exh. 1. Furthermore, to ensure reliable responses, the question asked by the survey was an open-ended one rather than filling in a simple blank or multiple-choice. Thus, the respondent would have to search his memory and actually write down the brand he did dispense rather than circling an answer. Dr. Vanderschmidt particularly reviewed the issue of an incomplete or false memory when the study was designed and concluded at the end of the study that, "Hearsay and memory risks were satisfactorily minimized." See Vanderschmidt Report, App. 2.

C.    **Even If The Study Is Somewhat Unreliable, The Study Is Still Admissible**

In Southland Sod Farms v. Stover Seed Co., 108 F.3d 1134 (9th Cir. 1997), the defendants raised on summary judgment the same arguments as Lilly does here against the technical reliability of plaintiff's survey. The Ninth Circuit held the defendants' objections, that the survey was only conducted in Southern California and asked leading questions, "go only to

13

the weight, and not the admissibility, of the surveys." <u>Southland</u>, 108 F.3d at 1143, <u>quoting E. & J. Gallo Winery v. Gallo Cattle Co.</u>, 967 F.2d 1280, 1292 (9th Cir. 1992) ("Technical unreliability goes to the weight accorded a survey, not its admissibility."). Surveys conducted under accepted principles pass <u>Daubert</u>. <u>U.S. v. Bighead</u>, 128 F.3d 1329, 1335 (9th Cir. 1997). Lilly, as the defendants in <u>Southland</u>, has not demonstrated that the survey violated accepted principles. "Unlike novel scientific theories, a jury should be able to determine whether asserted technical deficiencies undermine a survey's probative value." <u>Southland</u>, 108 F.3d at 1143, n. 8. Thus, in the present case, even if the study has some elements of unreliability – which it does not – this merely goes to the weight the jury may accord to the evidence, not to whether it is admissible.

### D. The Survey is Relevant and Will Aid the Finder of Fact In Determining Which Brand of DES Was Dispensed Toward Plaintiffs

Lilly next claims that the Sparr study should be excluded as irrelevant. Defendant contends that since Mr. Sparr cannot identify the brand of DES the particular Hingham Pharmacy (where Mrs. Delaney's mother purchased her DES) carried, his study is not probative. However, the Sparr study covers the "DES Market... dispensed in the Commonwealth of Massachusetts... from 1955 to 1971" and therefore includes the relevant pharmacy. <u>See</u> Sparr Report pg. 1, App. 4.

Hingham is in Massachusetts. As stated before, the majority of prescriptions in Hingham, and the prescription here at issue, are for an unspecified brand of DES. The key, relevant question in this case is: what brand or brands were most likely to be purchased by Plaintiff Julie Delaney's mother with her unspecified prescription that match the identification of the DES pill as testified to by the mother, i.e., small, white, round, cross-scored? The results of

the study – 94% of the DES dispensed for unspecified prescriptions in Massachusetts was the Lilly brand – go directly to the heart of this question.

Furthermore, another pharmacist in Hingham, too old to have been part of the study, and speaking of his own practice, said under oath in his deposition, "if I had a prescription for Stibestrol and I was going to fill it and there was no manufacturer stated on the original prescription by the doctor, I probably would have filled it with Lilly's." Dep. of George Price at 47, as App. 6. Sparr's study seems to be accurate description of the Hingham DES market, despite whatever faults the Defendant may ascribe to it.

Bolstering this position, courts have ruled that the results of statistical surveys are regularly relevant and used in product liability and mass tort cases. In Re Estate Marcos, Human Rights Litigation of, 910 F. Supp. 1460 (D. Haw. 1995); Reich v. Southern Maryland Hospital, 43 F.3d 949 (4th Cir. 1995). Furthermore, statistical summaries and what they represent go to the appropriate weight the court should give the evidence and not whether the evidence is admissible. Cox v. National Football League, 29 F. Supp. 2d 463, 468 (N.D. Ill. 1998); Schering v. Pfizer, 189 F. 3d 218 (2nd Cir. 1999). Thus, Sparr's opinions are both relevant and admissible, even if the study had some technical defects.

### E.    Pharmacist Sparr's Expert Experience Is Based On Extensive Interviews with Pharmacists Both in Boston and Around the State of Massachusetts

Mr. Sparr has other relevant experience and knowledge upon which to testify that Lilly DES was predominantly prescribed in the Commonwealth of Massachusetts. Mr. Sparr conducted hundreds of interviews with pharmacists across the state, and across the country doing research as to the prevalence of Lilly DES in the market place. (See App. 4). Mr. Sparr's research did not involve solely pharmacists directly involved in specific cases pending before courts. In point of fact, Mr. Sparr has taken many statements from pharmacists across the state,

many of whom he was acquainted with through professional and alumni organizations. <u>See</u> Sparr Dep. T87: 9-10, App. 7.

Defendant seeks to undermine the credibility of these interviews by noting that Plaintiffs' counsel requested the research. This just further underscores Defendant's confusion between admissibility and credibility. Credibility goes to the weight a court will accord such evidence, not whether it is admissible in the first instance. <u>See</u> <u>Seahorse Marine Supplies, Inc. v. P.R. Sun Oil Co.</u>, 295 F.3d 68, 73 (1st Cir. 2002) (holding that expert testimony was admissible and its strength should hinge on the jury's credibility findings).

### F. The Sparr Opinion Gibes With Other Evidence Which Points to Eli Lilly as the Proper Defendant

The Sparr opinion is an integral part of a patchwork of facts, which, in the aggregate, implicate Eli Lilly as the proper defendant. Plaintiffs have presented other evidence which supports the proposition that Lilly's DES was more likely than not the DES to which Julie Delaney was exposed. First, Plaintiff Julie Delaney's mother, Barbara O'Leary, described the DES she ingested as a small, white, cross-scored pill – a description which matches the Lilly $25_{mg}$ pill exactly. (<u>See</u> Dep. of Barbara O'Leary, p. 29-30, 37-38, 46, attached as App. 19 to Pls.' Opp'n to Def.'s Mot. for Summ. J, Docket No. 45.)

Second, Mrs. Delaney's mother's medical records state that, at the end of her pregnancy Mrs. O'Leary was to take 200mg of "stilbestrol" a day. (Barbara O'Leary's Medical Records, attached to Dep. of Philip G. Sullivan, M.D. as App. 14 to Pls.' Opp'n to Def.'s Mot. for Summ. J, Docket No. 45.) Mrs. O'Leary testified that she had to take eight pills a day to reach that dosage, verifying that she took a 25mg pill. (Dep. of Barbara O'Leary at 28, attached as App. 19 to Pls.' Opp'n to Def.'s Mot. for Summ. J, Docket No. 45.)

Third, the Physician's Desk Reference (PDR), which was found in every physician's office during Plaintiff Julie Delaney's pregnancy, only named Lilly as a retailer of DES; no other brand name was listed. See 1969 Physician's Desk Reference (attached as App. 20 to Pls.' Opp'n to Def.'s Mot. for Summ. J, Docket No. 45.) Thus, a doctor would be more likely to prescribe the brand listed in the PDR than to take a chance on an unknown and unlisted brand.

Fourth, Lilly utilized a wholesaler agreement whereby any wholesaler who wanted to carry Lilly products must fill any unspecified orders (prescriptions without brand names) with a Lilly drug. See Wholesaler Agreement, App. 8. Most pharmacies did not carry DES in the store, but rather ordered the drug one bottle at a time from a wholesaler. Therefore, if a doctor prescribed "DES" without a brand name specification, the pharmacy was likely to order the DES from the wholesaler unspecified and be supplied with a Lilly product. Finally, the Sparr opinion suggests that, in fact, over 90 percent of orders for DES were for Lilly products, which is bolstered by the Cafferty statement that Lilly had "the lion's share" of the DES market in the 1960s. Each fact, each brick mentioned above, is carefully laid to create a solid wall of proof, implicating Lilly as the supplier of DES in this case.

## II.    CONCLUSION

Without this Court hearing Mr. Sparr's observations and testimony, including Lilly's cross-examination, it would be premature for this Court to exclude his statement or his testimony. One would think that with Lilly's thousands of employees and salespeople out in the field, *someone* could come up with evidence of a non-Lilly product somewhere in the pipeline. Lilly's silence confirms their responsibility.

17

**WHEREFORE**, Plaintiffs pray the court to deny the Defendant's Motion to Strike Statement of Harold Sparr or, alternatively, to hold a F.R.E 104(a) hearing to take testimony and evaluate Sparr's study, opinion, and credibility.

Respectfully submitted,

/s/ Erica Tennyson
Juliet A. Davison (BBO# 562289)
Erica Tennyson (BBO# 660707)
TODD & WELD LLP
28 State Street, 31st Floor
Boston, Massachusetts   02109
(617) 720-2626
jdavison@toddweld.com
etennyson@toddweld.com

/s/ Aaron M. Levine
Aaron M. Levine (DC #7864)
AARON M. LEVINE & ASSOCIATES
1320 19th Street, N.W., Suite 500
Washington, D.C.  20036
(202) 833-8040
aaronlevinelaw@aol.com

Dated: December 4, 2006                    Attorneys for Plaintiffs

## CERTIFICATE OF SERVICE

I, Erica Tennyson, hereby certify that this document filed, Plaintiffs' Opposition to Defendant Eli Lilly's Motion to Strike the Statement of Harold B. Sparr, R.Ph., through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on December 4, 2006.

/s/ Erica Tennyson
Erica Tennyson (BBO# 660707)

## LOCAL RULE 7.1(A)(2) CERTIFICATION

I hereby certify that, pursuant to L.R., D. Mass. 7.1(A)(2), I have been informed that counsel for both parties conferred on November 20, 2006 and attempted in good faith to resolve or narrow the issues, but were unable to come to a resolution.

/s/ Erica Tennyson
Erica Tennyson (BBO# 660707)

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| _____ | ) | |
| JULIE DELANEY and | ) | |
| WILLIAM P. DELANEY | ) | |
| | ) | |
| Plaintiffs, | ) | |
| v. | ) | Civil Action No. 05-CV-10241 (MLW) |
| | ) | |
| ELI LILLY AND COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

## (PROPOSED) ORDER

**UPON CONSIDERATION** of Defendant's Motion to Strike the Statement of Harold

Sparr, R. Ph., and Plaintiff's Opposition thereto, and for good cause shown, it is this ___ day of

_____, 2006,

**ORDERED** that Defendant's motion be, and hereby is, DENIED.

_____
The Honorable Mark L. Wolf
United States District Court Judge

## CERTIFICATE OF SERVICE

I, Erica Tennyson, hereby certify that this document filed through the ECF system, (Proposed) Order regarding Plaintiffs' Opposition to Defendant Eli Lilly's Motion to Strike the Statement of Harold B. Sparr, R.Ph., will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on December 4, 2006.

/s/ Erica Tennyson
Erica Tennyson (BBO# 660707)