IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| JULIE DELANEY and WILLIAM P. DELANEY | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) | Civil Action No. 05-CV-10241 (MLW) |
| ELI LILLY AND COMPANY, | ) ) | |
| Defendant. | ) ) ) | |

## AFFIDAVIT OF AARON M. LEVINE, ESQ.
### REGARDING AUTHENTICATION OF DOCUMENTS

I, Aaron M. Levine, declare under penalty of perjury that the following is true and correct:

1. Attached as Appendix 1 is a true copy of the Corrected Statement of Philip J. Cafferty, dated November 17, 2003.

2. Attached as Appendix 2 is a true copy of pages 1-6 and the affirmation from Defendant Eli Lilly's Responses to Plaintiffs' First Set of Interrogatories.

3. Attached as Appendix 3 is a true copy of a selected page from the FDC Reports, August 10, 1959.

4. Attached as Appendix 4 is a true copy of selected pages from the FDC Reports, September 6, 1947.

5. Attached as Appendix 5 is a true copy of selected pages from the FDC Reports, May 29, 1961.

6. Attached as Appendix 6 is a true copy of selected pages from the FDC Reports, August 10, 1959.

7. Attached as Appendix 7 is a true copy of selected pages from Eli Lilly & Co., The Modern Apothecary, (H.S. Noel ed., Lakeside Press, R.R. Donnelly & Sons Co. 1941)

I declare under penalty of perjury that the foregoing is true and correct.

Aaron M. Levine

Dated: November 29, 2006

# Appendix 1

Statement of Philip J. Cafferty

October 22, 2003
* Corrections/additions underlined.

## CORRECTED STATEMENT OF PHILIP J. CAFFERTY*

I reside at 16 Triphammer Road, Hingham, MA 02043. I am 64 years of age and am a pharmacist and a former pharmaceutical representative of Eli Lilly and Co. I am familiar with the field of retail pharmacy inventory and stocking practices over the last 49 years in the Boston and Rhode Island areas, and the sales and marketing practices of Eli Lilly and Company for the last 49 years.

### Career

1.    I began my career in retail pharmacy in 1954 as a clerk and stock boy in a retail pharmacy in New England. Three years later, I began pharmacy school, but continued working in a retail pharmacy. From 1954, I have continuously been in the retail pharmacy industry as a clerk, pharmacist, detailman, or pharmaceutical district manager.

### Licensing

2.    I hold a degree in pharmacy from the University of Rhode Island and have been a licensed pharmacist since 1961, registered in the states of Massachusetts, Rhode Island and New York. I have been a member of the Massachusetts and Rhode Island Pharmacy Associations.

### Scope

3.    My employment in the field of pharmacy has given me the opportunity to be present at, observe, or converse with personnel in approximately 200 pharmacies in Massachusetts and Rhode Island over the last 49 years. In my experience over the last half century in dozens of drugstores, as a pharmacist, a pharmaceutical representative and detailman, both for Lilly and Miles Laboratory, I had the opportunity to review prescription forms, become familiar with drugs, drug popularity, as well as, physician prescribing habits. I have filled or reviewed drug prescriptions in the hundreds of thousands over the last 49 years. I am familiar with the practice of retail drugstores in the Boston and suburban retail pharmacies.

### Lilly Employment

4.    For 19 years commencing in 1965, I was employed by Eli Lilly and Company, Indianapolis, Indiana, as a professional representative or detailman and district manager. My duties included:

a.    Calling on retail pharmacies to introduce new Lilly products, restocking shelves of the pharmacies with new inventory, maintaining inventory with proper shelf-life order, replacing outdated merchandise, credit for return. In this effort, I had responsibility for the stocking of Lilly products in approximately 200 pharmacies in Rhode Island and Massachusetts. In this position, I would have the

October 22, 2003
Corrections/additions underlined.

opportunity to cull through store prescriptions to observe physician prescribing habits.

b.    Observing and originating reports regarding prescribing habits, frequency of prescription, popularity of prescription brands, drug indications, warnings, product presentation; and

c.    Investigating physician's prescribing habits for both Lilly and competitors. Detailing physicians and pharmacists, which included observing shelf products for Lilly as well as for its competitors and speaking to doctors regarding their prescribing habits. Obstetricians and Gynecologists were some of the doctors I detailed.

## Familiarity with the 1950s

5.    I have actually filled over 14,000 prescriptions since 1957. Even though at first I was a pharmacy student under the supervision of a pharmacist, I had the opportunity to read prescriptions from physicians, fill, label, and dispense the medication in over 20 cities for over a half century. In addition, I commonly ordered pharmaceuticals from wholesalers and manufacturers. I also was familiar with pricing policy and coding. I averaged between 30 and 32 hours per week until 1961 when I graduated, became licensed and became engaged in full-time pharmacy practices. From then on, I was a full-time pharmacist.

## Familiarity with DES

6.    I am familiar with Diethylstilbestrol, also known as DES and Stilbestrol. I filled on the average of three or four prescriptions a week for DES starting in the late 1950s, but I have seen it on shelves in pharmacies since 1954. I knew it was indicated for prevention of miscarriage, among other uses, and I knew it came in different strengths from .1 mg to 25 mg. and in white uncoated tables as well as red-coated pills. Diethylstilbestrol was the only popular oral hormone medication given in the 1950s and 1960s to pregnant women. It was the drug of choice and the standard treatment for pregnant women and the only popular oral medication regularly used for this purpose. I am familiar with the Lilly publication "De Re Medica" that was sent to the physicians of America, which advocates DES as the best medication for avoiding miscarriage.

## Review of Literature

7.    I have reviewed the commercial DES literature including PDR, Redbook, Bluebook, and U.S. Pharmacopoeia from the 1950s and 1960s. I have also reviewed Lilly publications in general from the 1950s and 1960s, such as field reference manuals, product labeling, inserts, product brochures, Tile and Till, The Lilly Digest and other Lilly publications regarding competitive pharmaceutical manufacturers. I was familiar with this material in the 1950s, 1960s and 1970s. From these readings as well as my observations of the practice of pharmacy, I observed what changes if any occurred in the

October 22, 2003
* Corrections/additions underlined.

marketing, ordering, stocking and dispensing of retail pharmaceuticals over the last half century. The practices have remained relatively stable during the last half century.

## Lilly's Publications

8.    I am familiar with Lilly's promotional publications in the 1950s, 1960s and 1970a especially De Re Medica, The Physician's Brochure, The Physician's Bulletin and other labeling. I recall detailing physicians in that period and observing these publications. I have seen them in drugstores, hospital pharmacies and doctor's offices.

## Survey of Pharmacists

9.    I have reviewed over 105 sworn statements of other pharmacists regarding the prevalence and availability of the Eli Lilly DES products in their stores in the 1950s and 1960s. I have personally spoken with 17 pharmacists in the New England area who were practicing in the 1950s and 1960s as to their recollection of the DES market. Results of this research point to Lilly as the unique and unrivaled supplier.

## Lilly Products and Inventory

10.    I recall the wholesaler strategy from the 1950s and 1960s by Eli Lilly and Company as well as their agreements with wholesalers throughout the country. Eli Lilly was the leading pharmaceutical manufacturer in America at that time with top market popularity because of its reputation, quality, control, efficiency of inventory and distribution through wholesalers. In the 1950s and 1960s Lilly was the only major pharmaceutical manufacturer from whom you could only order through a wholesaler and not directly from the company. Lilly was the only major drug house that employed licensed pharmacists as detailmen – this allowed them to have greater access to pharmacists and pharmacy stocking practices than any other company. Only the Lilly detailmen actually went behind the counter of a drugstore, pulled off outdated products and replenished the shelves. Lilly's practices enabled the retail pharmacists to save money. For example, DES was sold in eight forms: .1 mg, .5 mg, 5 mg and 25 mg both in coated and uncoated. This would require a pharmacist to invest in a minimum of eight bottles of 100 tablets. The pharmacist could receive a bottle at a time only from the Lilly wholesaler quickly, but for most of the other companies, ordering had to be done directly from the manufacturer, in larger orders, often taking a longer time requiring a greater investment in inventory at additional cost. Only Lilly, with its national network of Lilly wholesalers could allow a pharmacist to keep a single bottle of DES in one strength and color and get almost instant replenishment from the local wholesaler.

## Generics

11.    Regarding generic manufacturers and generic substitution as it is known today, this is a phenomenon of recent years only. In the mid and late 1950s, generic companies and generic drugs were virtually unknown and unused. It was not until the late 1960s the generics began their popularity.

October 22, 2003
* Corrections/additions underlined.

## The Red and Blue Books do not Reflect the Market

12. I have reviewed the Red and Blue Books as well as the PDR for 1954 and 1958 ad it applies to DES. Although the Red and Blue books may have listed many brands of DES available in the world, it is not an accurate presentation of the DES market in Massachusetts and Rhode Island during the 1950s and 1960s – the years of DES popularity. In all the pharmacies I have visited in Massachusetts and Rhode Island and of the hundreds of pharmacists I have talked to, I have never seen or heard of a DES product not manufactured by Eli Lilly. Perhaps some of the brands listed in the Red or Blue Books were dispensed in the South or on the West Coast, but not in Massachusetts or Rhode Island in any numbers. I have seen only Lilly's DES products in the drugstore of the Boston suburbs. If a doctor had specified a Squibb or Upjohn product, I am sure that the pharmacist would have had to fill the prescription that way, but if it were prescribed as merely DES, Stilbestrol or Diethylstilbestrol, it would have been filled with a Lilly product.

## Continuity

13. I spent one year in the home offices of Eli Lilly in the creation of marketing plans and was a sales manager, having 12 detailmen under me, thus enabling me to observe, in addition to my other experiences, Lilly's pharmaceutical marketing and their manipulation of markets throughout America in distribution, sales practices, sales techniques and sales strategies. These strategies, customs and practices did not significantly change between the mid-1950s and late 1970s. The DES market in the mid-1950s remained the same through the 1960s.

## Wholesaler Agreements

14. I have reviewed the Eli Lilly distributing and selling service agreement and Eli Lilly Warehousing and Distribution Service agreements. I have personal knowledge of their existence and workings over the last 45 years. Lilly entered into agreements with the following wholesalers in the New England area, with whom I am familiar: McKesson Robbins Company, the Gilman Brothers Company and the James W. Daly Cardinal Company. They were Lilly wholesalers and they controlled the Boston and Rhode Island pharmaceutical wholesaler distribution field. Under the agreement, these pharmaceutical wholesalers were obligated to provide a Lilly product "on all unspecified orders." The effect of this agreement was that if a local retail pharmacy ordered "DES," "Diethylstilbestrol" or "Stilbestrol" from these wholesalers, they would receive a Lilly product. The wholesaler was required to send a Lilly product or lose the Lilly account, which in those days was the biggest. I recall there were other brand name DES products. Squibb made a DES called Stilbetin and Upjohn made a DES called Perles, but these were trade names and had to be ordered that way by the physicians. Plain "DES" was always Lilly.

October 22, 2003
* Corrections/additions underlined

### Pill Description

15. The 25 mg. (pregnancy size) DES manufactured by Eli Lilly was a round white, cross-scored tablet without any other markings. It is pictured in the attached photograph. I am familiar with that drug, having dispensed it on hundreds of occasions. No other manufacturers have such a DES product.

### Conclusion

16. Based upon my observations of drugstores and familiarity with the pharmaceutical field, Lilly had the lion's share, if not all of the DES market. I observed no other brand of DES in stores in Boston and Rhode Island. Based on my experience and observations, it is inconceivable that I would not have seen or heard of a non-Lilly brand, had it been there.

I declare under penalty of perjury that the foregoing statement is true and correct and is based upon my personal knowledge of the facts set forth.

Date: 11/17/03

Philip J. Cafferty, R.Ph.

Witness:

5

# Appendix 2

Selection from Defendant Eli Lilly's Responses to Plaintiffs' First Set
of Interrogatories

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

JULIE DELANEY, et al.,

      Plaintiffs,

      vs.

ELI LILLY AND COMPANY,

      Defendant.

Civil Action No. 04-0349(ESH/AK)

## DEFENDANT ELI LILLY AND COMPANY'S RESPONSES TO PLAINTIFFS' FIRST SET OF INTERROGATORIES AND FIRST REQUEST FOR PRODUCTION OF DOCUMENTS AND/OR TANGIBLE THINGS

COMES NOW defendant Eli Lilly and Company (hereinafter "Lilly"), by and through its attorneys, Foley Hoag, L LP, pursuant to Rules 33 and 34 of the Federal Rules of Civil Procedure, and provides the following responses to Plaintiffs' First Set of Interrogatories and First Request for Production of Documents and/or Tangible Things to Defendant Eli Lilly and Company.

### PRELIMINARY STATEMENT

As a preface to each and every response to plaintiffs' interrogatories and requests, Lilly qualifies its response by stating that Lilly has not completed its investigation of the facts relating to this c ase, has not completed its discovery in this a ction a nd h as not completed its preparation for trial. Lilly reserves the right to amend or supplement these responses as discovery in the case progresses, as new facts are developed and as new information is obtained. Therefore, the following responses are given without prejudice to Lilly's right to produce any additional evidence at trial or in connection with any pretrial proceeding.

Some of the events relevant to this action occurred over sixty (60) years ago. Due to the lapse of time, many of the individuals having personal knowledge of these events are

deceased or otherwise unavailable and many of Lilly's documents are no longer available. As a consequence, Lilly's responses to these interrogatories and requests are necessarily limited by, and subject to, these qualifications.

The term diethylstilbestrol, as used in these responses, refers only to diethylstilbestrol. It does not refer to any chemically similar synthetic estrogen-like substance or to any congener of diethylstilbestrol.

## GENERAL OBJECTIONS

OBJECTION A: Lilly objects to these interrogatories insofar as they seek information for time periods beyond August 3, 1970, the date of birth for plaintiff Julie Delaney, on the grounds that such information is not relevant to any issue in this lawsuit and would not lead to the discovery of admissible evidence. It is apparent that no action by Lilly, its employees or any other person subsequent to that date could have any effect upon plaintiff Julie Delaney's alleged exposure to diethylstilbestrol.

OBJECTION B: Lilly objects to these interrogatories to the extent they seek information unrelated to the use of diethylstilbestrol for the prevention of certain accidents of pregnancy. The prescription drug, diethylstilbestrol, was approved by the Food and Drug Administration (FDA) for a variety of human uses other than use as an aid in the prevention of certain accidents of pregnancy. These indications did not involve the use of diethylstilbestrol in pregnant women, the only use that plaintiffs allege in their complaint and the only use relevant to this action. Accordingly, information concerning other uses for diethylstilbestrol is irrelevant and has no bearing upon the issues in this case nor is discovery into those uses reasonably calculated to lead to the discovery of evidence admissible at trial.

OBJECTION C: Lilly objects to these interrogatories to the extent they seek information concerning the manufacture, distribution or sale of diethylstilbestrol in sizes and

forms o ther t han 5  and  25mg o ral d osage f orms, o n t he  grounds t hat i nformation c oncerning dosage sizes other than those indicated for use in prevention of accidents of pregnancy is irrelevant and not reasonably calculated to lead to the discovery of admissible evidence.

OBJECTION D:  Lilly objects to these interrogatories to the extent they seek information relating to injuries or adverse effects other than those alleged by plaintiffs on the grounds that such information is irrelevant and not reasonably calculated to lead to the discovery of admissible evidence.

OBJECTION E:  Lilly objects to these interrogatories to the extent they seek information protected by the attorney-client and/or the attorney work product privilege.

OBJECTION F:  Lilly objects to these interrogatories to the extent that they are irrelevant and not reasonably calculated to lead to the discovery of admissible evidence.

OBJECTION G:  Lilly objects to these interrogatories and definitions on the grounds that they are vague and overbroad to the extent they may exceed the scope of discovery allowed pursuant to the Federal Rules of Civil Procedure.

## INTERROGATORIES

1.      Non-Lilly Contention

Do you contend that Plaintiff Julie Delaney was not exposed to the Lilly brand of diethylstilbestrol ("DES")?  If so, state the factual basis of your contention.

RESPONSE:  Lilly incorporates herein its objections E and G.  Lilly further objects to this interrogatory as an improper attempt by plaintiffs to require Lilly to prepare plaintiffs' case.  Lilly further states that plaintiffs have the burden of proving the facts necessary to establish the elements of their alleged cause of action, including the cause of any alleged injuries.  Without waiving and subject to its objections, Lilly states that it has not completed its investigation and discovery in this matter, and cannot fully respond to this interrogatory at this

time. Because such information is not within the direct knowledge of Lilly, Lilly can only respond to the extent that the information is obtained through discovery, which is still ongoing. However, documents such as the *American Druggist Blue Book* and the *Drug Topics Red Book* show that many manufacturers had DES available for purchase by Hingham, Massachusetts pharmacies in 1970. The fact that many manufacturers' DES was available for purchase by pharmacies in Hingham, Massachusetts in the relevant time period is evidence that the DES allegedly taken by Plaintiff's mother, prior to her birth, could have been manufactured and sold by companies other than Lilly. Lilly's attorneys are currently investigating this issue and this answer will be supplemented if information responsive to this interrogatory is discovered. At the present time, the witnesses identified by plaintiffs may have information concerning the manufacturer(s) of any medications plaintiff's mother allegedly ingested during her pregnancy with plaintiff.

2.      Witness for Non-Lilly Contention

Identify each and every individual(s) known to you, your attorneys or investigators, who may have any information concerning the identity of the brand of DES as set forth above.

RESPONSE: Lilly incorporates herein its response to Interrogatory No. 1.

3.      White Cross Score

Do you contend that in the year of exposure as set forth in the Complaint, any manufacturer other than you, bottled or distributed DES in the dosage sizes indicated for use in prevention of accidents of pregnancy, as a round, white cross-scored non-imprinted tablet? If your answer is yes, identify the product or the manufacturer and any documents (by date, description or custodian), upon which you rely in making this statement. For your information, it

appears that the Squibb 100mg was imprinted with their name and that the Amfre-Grant was hexagonal.

RESPONSE:  Lilly incorporates herein its Objection E.  Lilly further objects to this interrogatory to the extent it assumes that all of Lilly's diethylstilbestrol in dosage sizes indicated for use in the prevention of certain accidents of pregnancy were round, white, non-imprinted and cross-scored.

Lilly further objects to disclosing a description of the diethylstilbestrol manufactured and distributed by Lilly on the grounds that this information is not necessary at this time for plaintiffs' preparation for trial and would be unduly prejudicial to Lilly. Identification of the manufacturer through a physical description of the product used in the pregnancy is an issue presented in several other lawsuits.  If the information requested is disclosed in this litigation, it will be disclosed for all practical purposes in all litigations, thereby depriving Lilly of any opportunity to test the recollection and veracity of persons suing to recover for injuries allegedly caused by diethylstilbestrol.

Lilly further objects to disclosing a description of the diethylstilbestrol manufactured and distributed by Lilly prior to deposing all fact witnesses who may have knowledge concerning the product allegedly ingested by plaintiff's mother.  Lilly reserves the right to further object if those witnesses are unable to describe the product allegedly ingested by plaintiff's mother.

Lilly further objects to this interrogatory to the extent it asks Lilly to provide information pertaining to other companies as an improper attempt by plaintiffs to require Lilly to prepare plaintiffs' case. Lilly further objects to this interrogatory on the grounds that it is overly broad and unduly burdensome to the extent it requires Lilly to conduct research concerning the

appearance of the diethylstilbestrol products of the numerous companies who manufactured and/or distributed diethylstilbestrol during the relevant time period.

Without waiving and subject to its objections, Lilly answers, yes.  Lilly further states that over the period of time in which diethylstilbestrol was approved by the FDA for use in pregnancy, over 300 companies marketed 5 mg. or larger dosage sizes of diethylstilbestrol.  This information comes from the following publicly available reference sources:  *Modern Drug Encyclopedia and Therapeutic Index, Physicians' Desk Reference, American Drug Index, Drug Topics Red Book, American Druggist Blue Book, Executive Directory of U.S. Pharmaceutical Industry, Standard and Poor's Corp.'s Standard Corporation Descriptions, Moody's Investors Service, Inc., Moody's Industrial Manual* and *Dun & Bradstreet.* These sources contain little information about the description of a particular company's product, and many of those companies ceased to exist well before this, or any diethylstilbestrol litigation, began.

Prior to the commencement of any diethylstilbestrol litigation, to the best of its knowledge, Lilly did not compile information concerning the description of diethylstilbestrol manufactured and/or marketed by other companies.  Lilly has no information from any source about the description of the diethylstilbestrol products of the vast majority of the over 300 companies.  Although there were numerous companies which described their diethylstilbestrol as "scored," it is unclear which were cross scored.

4.    Lilly Wholesalers

Identify the Lilly distributors or wholesalers serving the alleged city of exposure during the relevant time period, and describe any agreements made between you and them regarding giving preference to Lilly products, or attach the agreement(s) to your answer.

By: _John E. Leahy_
John E. Leahy
Associate General Counsel

STATE OF INDIANA      )
                      : ss.:
COUNTY OF MARION      )

On this 29th day of July, 2004, before me appeared John E. Leahy, Associate General Counsel, Eli Lilly and Company, who stated that he signed the above Responses to Plaintiffs' First Set of Interrogatories and First Request for Production of Documents and/or Tangible Things to Defendant Eli Lilly and Company but that many of the facts set forth in such Responses are not within his personal knowledge, having been assembled and compiled by others within the employ of Eli Lilly and Company at his direction, as to which facts he is informed and believes the same to be true and that the remaining facts are known by him to be true.

Subscribed and sworn to before me this 29th day of July, 2004.

_Jean C. Ballinger_
Jean C. Ballinger, Notary Public
Resident of Marion County, IN
My Commission Expires: 01/05/09

968267v1

# Appendix 3

Selection from FDC Reports, August 10, 1959

Founded 1939 — $125.00 a year

# F-D-C REPORTS — *"The Pink Sheet"*

TRADEMARK REG. U. S. PAT. OFFICE

## DRUGS AND COSMETICS

A SPECIALIZED PUBLICATION FOR EXECUTIVES IN THE DRUG, COSMETIC AND RELATED INDUSTRIES. PUBLISHED BY F-D-C REPORTS, INC., 1152 NATIONAL PRESS BLDG., WASHINGTON 4, D. C. PHONE ME 8-4463. ISSUED EVERY MONDAY.

Volume 21, No. 32                                                                                       August 10, 1959

## THE NEWS THIS WEEK

CONTENTS COPYRIGHTED, © F-D-C REPORTS INC., 1959

### TRADE & GOVT. MEMOS:     (Pages 15 - 17)

* Los Angeles Drug's whsle. volume up 4.6%, from $17.3 to $18.1 mil.
* D. Kaltman adds 2 to board, sets up exec cmte. for expansion.
* Colgate-Palmolive paid $1.67 mil. in stock for Sterno Corp. (canned heat)
* Bergen Drug's, NJ whslr., FT family petition plan seeks 250,000 signers
* B-M & Sterling healthy 2nd quarter nets follow drug-cosmetic pattern

* Carrtone Labs to set up 50-50 in Puerto Rico with local MD's
* FDA's delisting order will carry some colors for at least nine months
* Vet drug escape hatch may come through revised "safety recognition" setup
* Squibb's vet hormone growth promoter to get zero tolerance petition
* Deafness from dihydrostreptomycin probed by FDA for regulatory action

** **FEDERAL FT DRIVE** gains new momentum, may achieve this year's objective
--- House passage --- if supporters can bring in necessary
"back home" pressure to lift House Rules Cmte. blockade. State pharmaceutical
secretaries building up steam for FT from home offices and by Washington visits.
Ohio trying to marshall same force that pushed state law over veto.

   States' righters propose new obstacle to effective federal FT during Rules
Cmte. hearings, started Aug. 3 and continuing Aug. 10. They may propose far-
reaching amendments from House floor which would nullify effective national FT
system, and invite sure-fire veto from President. Sen. Humphrey may try to get
FT bill action in Senate this year to put controversial issue behind him before start
of presidential election year.                                              (Page 3)

** **INDEPENDENT DRUG STORE** is in sound financial condition, even though a
substantial number of pharmacies showed
poorer '58 records, the 27th Lilly Digest indicates. Independent druggists' aver-
age ratio of assets to liabilities is 3.5-to-1, good cover for current obligations,
but report shows 15% of pharmacies operating at a loss in 1958 --- highest in

(PLEASE TURN PAGE)

ADDITIONAL COPIES OF F-D-C REPORTS: $48.00 Each Per Year When Mailed In Same Envelope With $125.00 Subscription Copy.

CONTENTS OF F-D-C REPORTS ARE NOT INTENDED FOR REPUBLICATION OR DUPLICATION IN WHOLE OR PART IN ANY FORM WHATSOEVER.

# Appendix 4

Selection from FDC Reports, September 6, 1947



**F C REPORTS**
"The Pink Sheet"

## THE NEWS THIS WEEK
### (continued)

recent years -- and another 15% reporting less than 2% net on sales. Lilly Digest figures and American College of Apothecary operating results on stores with comparable total average volumes indicate pharmacist-owners of general-type stores (with good Rx depts.) have better takes (net-plus-withdrawals). Rx refills continue post Durham-Humphrey upward spiral.          (Page 12)

* * <u>NATL. HEALTH FEDERATION</u>, an organization which gave Rep. Delaney its annual award in '58, asks Congress to spend some govt. medical research funds in "drugless fields of healing." In testimony before a House Interstate subcmte. hearing on a bill to create an international medical research institute, Harold Edwards, Federation VP, stressed benefits that might result from greater interest in nutrition. "Cancer over the ages has yielded to a dietary of simple foods," he tells subcmte.

<u>Citing chiropractors</u> as largest group in drugless field, Edwards asks for few "sorely needed" dollars for research in this area. Delaney's award acceptance speech before Federation last Oct. tells how he got cancer clause into food additive law and gives clue to his McCarthy-like hold over FDA. Natl. Federation, with 10,000 dues-paying members in 300 chapters, has headquarters in San Francisco, but maintains Washington office to watch over health matters during Congress.
                                        (Page 6)

* * <u>NUTRITIONAL QUACKERY</u> is costing 10 million Americans $500 mil. each year according to AMA estimates, Wallace Janssen, FDA Public Information Div. director, warns in U.S. Public Health Service publication. He says food faddism has aspects of organized movement.   (Page 10)

* * <u>COLOR ADDITIVE LEGISLATION</u> will have to be bought by industry on a "pig-in-a-poke" basis, but the alternative is going without coal tar colors, according to a highly-placed FDA official, commenting on the probability that none of the 17 colors facing FDA delisting are likely candidates for immediate provisional listing under the color additive bill. Looks like lever to force drug support for new law.                 (Page 11)

* * <u>DRUG RESEARCH REPORTS</u> ("The Blue Sheet"), an affiliate of "F-D-C," will have stories in Aug. 12 issue on: Eisenhower weighing establishment of new medical research advisory council along lines urged a year ago by Pharmaceutical Mfrs. Assn.; Merck's Connor, testifying before House subcmte. on international research bill, says matching basis for foreign grants OK for industrialized Europe & Japan but won't accomplish purpose in underdeveloped areas -- also discloses Russian claim to invention of Sabin oral polio vaccine which was furnished by his co. Bill won't pass House this session.

F-D-C REPORTS IS PUBLISHED WEEKLY BY F-D-C REPORTS, INC., 1152 NATIONAL PRESS BLDG., WASHINGTON 4, D. C., WALLACE WERBLE, PRES. ANNUAL SUBSCRIPTION RATES: (1) $125.00; OR (2) $48.00 WHEN MAILED IN SAME ENVELOPE WITH $125.00 SUBSCRIPTION.   SECOND CLASS MAIL PRIVILEGES AUTHORIZED AT WASHINGTON, D. C. POST OFFICE.



FDC Reports     9/6/47

Page -2-

general US business conditions.  It looks like inventory adjustment is completed; more normal buying is replacing hand-to-mouth operation.  One co. reports that 4 of its popular priced Christmas sets were sold out before Labor Day;  another co. -- tops in dentifrices and mass commodity items -- reports sales are up.  Old line houses are trying not to oversell market on holiday goods; they want to avoid last yr.'s experience on returns.

There's no lack of cosmetic advertising and promotion plans.  Though the rate has declined from the high of 18 months ago, there are still a number of new products being introduced or en route.  The number of new cos. has dropped, and smaller ones have fallen by the wayside.  Advertising straws in the wind:  Lady Esther's million dollar lipstick campaign; Kathryn's (the Harry Daumits') half-million dollar campaign for Nu-Youth, $1 hormone cream; Toni's purchase of time for 6th net show  bringing its total ad budget for next yr. up to $6 million; Lambert's search for a fall network show; Kreml's addition of a Billy Rose radio show; and many others, including reorganized Associated which is spending $110,000 this fall on Chen Yu -- deglamourized, hard selling copy.

Other straws in the wind: Lambert and others have mass distribution products on test -- shave creams, deodorants, etc.  Burma-Vita has a tooth powder. Corday is bringing out its first post-war perfume, Fame at $18 per oz.; Coty is returning Chypre to the line. While Dana cut prices 20%, most other big perfume names have not followed suit. Mens' lines have settled down for the long pull -- in the popular priced field there's a noticeable trend to $1 sets.  Premiums and special deals are being used -- Squibb's toothpaste, Jergen's Lotion and Dryad; Woodbury's Cream and Fiesta powder; Williams' introductory free tube of shave cream; Associated Merchandising's new packages for While Lilac private brand.

* * * * *  DRUGGISTS GET THEIR BEST RETURNS ON PROPRIETARIES, according to a report by American Druggist's John McPherrin before APhA convention.  Formally titled "Economics of Rx Practice", but re-titled "Are you making any money?", report was based on an experimental cost of operations and time study made in a single "guinea pig" drug store and financed by a well known wholesaler.  This store made 45% gross on Rx's but had an operating loss of 6% when expense was allocated -- "loss" amounted to $100 per month. McPherrin said pharmacist must charge at least $3.00 per hr. for his time -- not $1.50 as most do now.

Soda fountain in pilot store wasn't making any money, either.  It was doing 23% of dollar volume but at a net loss.  Rx dept. in this store accounted for 7% of total volume; proprietaries 19%.  But instead of losing money, proprietaries more than carried their load -- they returned 37% of gross profit and 23% of the net. Periodicals, with their fast turnover made 12% of the net.  Similar time studies on a broader basis are indicated to shed more light on drug store operations.

'46 Lilly Digest shows drug store profit-sales  ratio going down with rising dollar volume.  Based on over 1,000 stores,  '46 profits  were 8.6% of sales compared to 9.5% in '45 and 9.8% in '44.  Decline in profit ratio is attributed

# Appendix 5

Selection from FDC Reports, May 29, 1961



# F-D-C REPORTS

TRADEMARKS REG. U. S. PAT. OFFICE
1152 NATL. PRESS BLDG.
WASHINGTON 4, D. C.

*Drugs and Cosmetics*

Founded 1939 — $125.00 a year

*"The Pink Sheet"*

Rayden Stewart, Senior Editor

Raymond Galant, Associate Editor

Wallace Werble, Editor and Publisher

Arthur L. Davis, Editorial Director

Miss Freda Alt, Subscription Manage
Mrs. Barbara Calomeris, Asst. to the Editor
Edward G. Picken, Circulation Manager

---

## CALIF. Rx FEE ANTITRUST TRIAL DELAYED FOR A WEEK; DEFENSE FILES NEW DISMISSAL MOTION RESTATING PROFESSIONAL ARGUMENT

The May 22 opening of the Northern Calif. Rx fee schedule criminal antitrust trial was delayed for a week when Federal Judge Louis E. Goodman, who was assigned to hear the case, rescheduled the starting date to Thur., May 25, and later again postponed the start of the trial until Mon., May 29, (today). The delay resulted from Judge Goodman's hospitalization for diagnostic tests.

¶ Defense attorneys, meanwhile, filed a new motion for dismissal of the criminal antitrust indictment against the Northern Calif. Pharmaceutical Assn. (NCPA) And Donald K. Hedgpeth, pharmacist who prepared the Rx fee schedule widely used by NCPA members.

¶ The new motion again raises the basic issue of whether a pharmacist, in dispensing an Rx drug, is merely <u>selling</u> a commodity that has moved in interstate commerce or is <u>rendering a professional service</u> that removes his action from the areas of trade and commerce covered by the anti-trust statutes.

The defendants, their counsel, and prosecuting attorneys for the Justice Dept.'s Antitrust Div. appeared on Mon., May 22, as scheduled, before Federal Judge William T. Sweigert who was serving as the assignment judge for the San Francisco Federal Court. He assigned the pharmacy antitrust case to Judge Goodman.

### Professional Fees Exempt From Antitrust, APhA Contends

The defense got a break when the case was sent to Goodman. This eliminated fears that the trial might be heard by Federal Judge Lloyd H. Burke, who had previously indicated strong feelings when he rejected a defense motion on March 20 for postponement of the trial until next fall.

In refusing to delay the trial until next fall, Burke said the public interest was keenly involved. From the bench, he raised the question of whether patients who had paid for Rxs on the basis of the fee schedule could initiate private, triple-damage antitrust suits if the govt. won the criminal case. The San Francisco daily newspapers headlined his comments ("F-D-C" March 27).

The 13-man slate of Atlas directors elected at the Mar. 27 meeting did not include any Stuart officers. The merger statement said Atlas "has agreed to use its best efforts, subsequent to the merger, to cause Arthur Hanisch ... to be elected a VP and director of Atlas" -- or, if he chooses not to serve on the board, to elect a nominee of his choosing, so long as the Stuart principal stockholders own 300,000 Atlas common shares.

Hanisch will continue to direct the Stuart operation. After full conversion, Hanisch, Pelletier, and Pringle combined will own 580,140 new Atlas shares -- 13.8% of the total to be outstanding.

Chemicals accounted for almost 50% of Atlas's $70.9 mil. sales in 1960 and about 58% of the $3.0 mil. earnings. Research expenditures were 6% of sales -- about $4.3 mil.

The Atlas proxy statement, stating "Reasons for the Merger," said that "a major expansion" in the company's research and development has taken place over the past decade." As a result of expansion in food additives, it said, Atlas "has developed skills for evaluating physiological effects of numerous compounds. Utilization of these skills in the drug field appears desirable." Reflecting the merger, the corporate name will be changed to Atlas Chemical Industries, Inc.

Over the past several years, profit ratios for Stuart have been much better than for Atlas. A pro forma comparison, assuming combined operations, indicates a striking potential improvement in Atlas's gross and net ratios from the merger -- assuming Stuart's ratios will continue to be as favorable as they were up to 1960.

Chairman-President of Atlas is Ralph K. Gottshall, who owns 2,366 shares of Atlas's 763,100 total outstanding (pre-split). Gottshall drew $72,327 remuneration in 1960. Other salaries were: $65,154 for Exec VP Edward J. Goett, $50,040 for VP Edward J. Massaglia, and $46,733 for new VP Max E. Colson. Atlas's total assets at Dec. 31, 1960 were reported as $55.5 mil., compared with Stuart's $4.9 mil.

Atlas sales of explosives reached a record high in 1956, but have been encountering vigorous competition from fertilizer-grade ammonium nitrates.

ATLAS & STUART RATIOS-TO-SALES

|  | Atlas | | Stuart | |
|---|---|---|---|---|
|  | 1960 | 1959 | 1960 | 1959 |
| Cost of Goods Sold | 65.3% | 64.9% | 32.9% | 32.9% |
| Sell., Adm., Gen. Exp. (a) | 21.2 | 19.8 | 48.8 | 42.3 |
| Net Before Taxes | 8.2 | 10.1 | 18.4 | 24.8 |
| Net After Taxes | 4.2 | 5.5 | 9.5 | 12.5 |

(a) Atlas Cost of Goods Sold and Expenses do not include depreciation & amortization -- 4.8% of sales each year.

## LILLY REVISES WHSLR. DISCOUNTS -- FROM FLAT TO VARYING MARGINS; CHOICE WAS BETWEEN CHANGING DISCOUNTS OR WHSLR.-ONLY MARKETING

Lilly's switch from a straight-line, uniform whslr. discount to a system of "varying discounts" -- announced to its whslrs. last week -- represents an effort by the pharmaceutical firm to remain competitive and still maintain its traditional "whslr.-only" distribution policy.

Effective July 1, Lilly will replace its long-time uniform whslr. discount of 15 & 7% with a set of three discounts -- one for each of three categories of products into which its entire line is being divided.

¶ The largest category -- volumewise -- consisting chiefly of trademarked pharmaceutical specialties, will have a discount of 16-2/3%.

¶ The vitamin category, including trademarked specialties as well as "competitives," will have a 20% discount.

¶ An Rx parenteral category will have discounts of 10% and 16-2/3%, and whslrs. will be encouraged to pass on the 10% to retail pharmacists as an incentive for increasing the volume of Lilly products marketed in this highly competitive area where MDs are the major customers.

Faced with the mounting costs and competitive pressures that have combined to cause the current pharmaceutical marketing revolution, Lilly virtually had to make a choice between abandoning its traditional whslr.-only policy or bringing its whslr. discount structure more into line with the realities of today's drug market.

### Beesley Cites "Today's Competitive & Rapidly Changing Markets"

No dyed-in-the-wool Lilly man could ever concede that the company had given a moment's thought to abandoning its whslr.-only policy. Recent Lilly operating statements and the current facts of pharmaceutical marketing life, however, made it evident that the company had to give serious consideration to changing either its distribution policy or its discount structure.

¶ The new discount structure, Lilly President Eugene Beesley explained in a brief public statement, "will facilitate the distribution and selling of Lilly merchandise in today's competitive and rapidly changing markets."

¶ "As a result of continuous study," Beesley declared, "it is our conviction that distribution of Lilly merchandise through the whslr. continues to best serve the public's health needs and the professional and business interests of pharmacy and medicine."

The new discount structure, the Lilly president predicted, "should place both the Lilly whslr. and the Lilly Company in a better position to compete successfully for the expanding markets for pharmaceutical products."

All the figures, marketing logic and explanations in the world, however, won't convince whslrs. that they will be better off with lower discounts. Within the past year, they've had a series of jolts from other pharmaceutical houses, and drug whslrs. are faced with their own critical figures and operating problems.

Lilly historically provided the business bulwark for its selected group of franchised whsle. distributors which totaled 344 in the U.S. at the end of 1960. Its uncompromising whslr.-only distribution policy and its wide, unvarying discount have served to underwrite the economics of the so-called "full line, service" whsle. drug distribution system.

In effect, the Lilly policy and the Lilly discount helped to carry the costs of servicing retail pharmacists with other lines and products that were unprofitable for the whslr. The Lilly system almost guaranteed the franchised whslr. a profit for staying in business.

This made the whslr.'s business life a lot easier. He didn't have to face the hard choice of eliminating unprofitable lines and products.

New Margins Make Lilly Products Stand On Their Own Feet, Too

The wide margin on Lilly products and other pharmaceuticals even helped the whslr. carry less essential, lower-yield lines and items that the retail pharmacist has historically handled and has greatly expanded in recent years as chains and other competition have widened their merchandise lines.

The revision in the Lilly discount, on top of the earlier changes in marketing policy by other pharmaceutical houses, means that the whsle. druggist, more than ever, must re-evaluate his entire business operation to make certain that all his lines and products carry their own weight in costs and profits.

The whslr.'s loyalty, in fact, will be put to an unprecedented test by the Lilly change. Whslrs. reacted violently to the earlier changes by other pharmaceutical mfrs., and it remains to be seen whether they will recognize that Lilly had to revise its discount in order to maintain its whslr.-only policy.

The Lilly revision also serves to put the products in its own line on a self-carrying basis. This is indicated by the way in which the three new Lilly product categories are being established. The pharmaceutical specialty category, for example, contains products that depend largely on the company's promotion program and detail staff for their sales volumes.

These are products which the MD must prescribe before a sale can be made, and there is little the drug whslr. can do to increase the volume on them. His function is to maintain adequate distribution. Apparently Lilly felt that this justified the lowest discount. Whslrs. have been handling the distribution function for similar products of other mfrs. at the same discount.

Lilly obviously felt that a higher discount was justified for its vitamin and "competitive" category because this one includes products whose sales volume can be influenced, in a measure, by the activity of whsle. druggists and their salesmen.

In the days before the era of pharmaceutical specialties, the Lilly policy and discount worked well for both the company and its whslrs. because a large share of the volume was in "competitive" products whose volume could be increased by zealous whslr. support. With the advent of specialties, the relative share of volume for "competitives" dropped sharply.

Lilly specialties now must compete with strong and entrenched pharmaceuticals marketed by other companies -- big and little. Under the new competitive conditions, Lilly couldn't live forever off the "whslrs.' love." And in the long run, if Lilly lost out in the competitive race, the flat, higher margins wouldn't have meant too much to the whslrs.



The Lilly policy and discount, in effect, meant that Lilly consistently received less from the sale of products than its competitors received from the sale of theirs. Lilly President Beesley had to remind Sen. Kefauver (D-Tenn) of this when he appeared before the Senate drug hearings last fall.

## Lilly Still Adheres Strictly To Principle Of Fair Trade

Kefauver was comparing the whsle. prices of penicillin products from various pharmaceutical mfrs. when Beesley called his attention to: "The price that Lilly receives is less a discount of 15 & 7% which would bring that down substantially." The same situation was brought out during the polio vaccine antitrust trial.

The 10 & 16-2/3% discount on Lilly's third new category of products -- Rx parenterals -- obviously was designed to introduce greater flexibility into its pricing of these highly competitive items. This change indicates that Lilly will push for a greater share of the mass-markets that are rapidly increasing, both in size and in competitive activity.

The new Lilly whslr. agreement also will provide greater flexibility to compete for hospital business, bulk orders and special offers. Its hospital list is being expanded from tax-supported to include all tax-exempt ones. But nothing in the new Lilly program changes its strict adherence to the principle of fair trade.

# Appendix 6

Selection from FDC Reports, August 10, 1959



# F-D-C REPORTS

TRADEMARK REG. U.S. PAT. OFFICE

**Drugs and Cosmetics**

1152 NATIONAL PRESS BLDG.
WASHINGTON 4, D. C.

Founded 1939 — $125.00 a year

*"The Pink Sheet"*

V̇ ̇ce Werble, Editor and Publisher
Royden Stewart, Senior Editor
Richard L. Taylor, Associate Editor

Arthur L. Davis, Editorial Director
Joseph J. Honick, Reader Service Director

Miss Freda Alt, Subscription Manager
Mrs. Barbara Calomeris, Asst. to the Editors
Edward G. Picken, Circulation Manager

## FEDERAL FT DRIVE FOR HOUSE PASSAGE HAS NEW LIFE, BUT RULES CMTE. HEARING SHOWS NEW THREAT: STATES RIGHTS' AMENDMENTS

The federal fair trade (FT) drive on Capitol Hill, which came to life again two weeks ago ("F-D-C" Aug. 3), has continued to gain momentum and there is a good chance that this year's objective -- passage by the House -- can be achieved, if FT supporters can produce the necessary amount of mail and telegrams from "back home" to convince Congress that "small business" really wants the Harris bill.

¶ The House Rules Cmte. held a hearing Mon. Aug. 3 on clearing the Harris bill for a vote on the House floor, and the all-powerful cmte. is continuing its consideration of the measure on Mon. Aug. 10. The Rules Cmte. will send the bill to the House floor if it is convinced there is enough pressure behind it from the folks back home.

¶ A new threat to the enactment of an effective federal law was disclosed when states' righters indicated at last week's Rules Cmte. hearing that they might propose amendments on the House floor which could nullify the basic purpose of the Harris bill -- establishing a national FT system.

### State Pharmaceutical Sectys. Building Steam at Home and in Washington

After its Aug. 3 hearing, the Rules Cmte., which had been blockading the FT bill, laid the measure aside for the rest of the week while it considered the controversial labor-management anti-racketeering bill. With Congress hoping to go home by Labor Day, the Harris bill must get out of the Rules Cmte. in a few days to avoid being crushed in the last-minute rush to adjournment.

The new life in the FT drive results from increased activity on the part of all supporters. NARD's Dargavel has been in Washington. A group of Washington trade assn. execs, representing non-drug retailers, met with House Interstate Cmte. Chairman Harris (D-Ark.) last week to show him that there is widespread support among all types of small businessmen behind his bill.

State pharmaceutical secretaries also have been building up the steam for FT -- from their own offices back home and by visiting Washington. FT's slim majority on the 12-man House Rules Cmte. may well depend on NY Secty. Gesoalde's contacts with Rep. Delaney (D-NY). Mass. Secty. Silverman is working on a wave of telegrams in hopes of showing Rep. O'Neill (D-Mass.), a member of the Rules Cmte., how his vo ̇ ̇rs feel. O'Neill also represents an important vote on the Rules Cmte.

AVERAGE INDEPENDENT DRUG STORE IS IN SOUND FINANCIAL CONDITION,
BUT OPERATING STATEMENTS INDICATE PROBLEMS, LILLY DIGEST SHOWS

The average independent drug store is in sound financial condition -- despite a record of 1958 operations that was poorer than 1957 for a substantial number of pharmacies -- it is indicated in the 27th Lilly Digest report to be distributed in a few weeks. The Lilly figures show the independent druggist's average ratio of assets to liabilities is almost 3.5 to 1, thus indicating an ability to take c    of current obligations. About 58% of his assets are in merchandise inven

Lilly's 1958 study included the operations of 2,429 stores -- nearly 5% of the total number of Independent pharmacies. (See table below for average balance sheet figures, weighted to compensate for the larger volumes enjoyed by the stores reporting to the Lilly Digest as compared with drug stores in general.)

The independent druggist's financial strength is important to manufacturers, wholesalers, and the drug field as a whole because he continues to constitute the major channel of distribution. In 1958 independents accounted for nearly 80% of the $6.6 bil. total retail drug volume reported by Commerce. Dept.

The Lilly Digest's average volume figures for 1958 differed from Commerce Dept. data. Average store volume was reported by Lilly as $126,191 in 1958, down slightly from the Digest's average of $126,466 for 1957. Commerce reported total retail drug volume up 4.3% in 1958 over 1957, with independent gaining 3.7%

Lilly explained its 1958 study included a large  roportion of low-volume pharmacies than in 1957. A separate tabulation of 747 pharmacies which reported to Lilly in both 1957 and 1958 showed an average volume increase of 5.8% for these stores.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

LILLY DIGEST AVERAGE BALANCE SHEET FOR INDEPENDENT DRUGGISTS
    (Weighted to compensate for larger volume of Lilly Digest stores)

| Assets: | 12/31/58 | 12/31/57 |
|---|---|---|
| Cash | $ 3,530 - 11.9% | $ 3,660 - 13.0% |
| Inventory | 17,150 - 58.0% | 15,980 - 56.8% |
| Fixtures, equipment | 6,320 - 21.4% | 6,140 - 21.8% |
| Accts. receivable | 2,250 - 7.6% | 2,080 - 7.4% |
| Other assets | 320 - 1.1% | 290 - 1.0% |
| Total assets | $29,570 - 100.0% | $28,150 - 100.0% |
| Liabilities and Net Worth: | | |
| Accts. payable | $ 4,310 - 14.6% | $ 4,080 - 14.5% |
| Notes payable | 3,550 - 12.0% | 3,440 - 12.2% |
| Other liabilities | 620 - 2.1% | 590 - 2.1% |
| Total liabilities | $ 8,480 - 28.7% | $ 8,110 - 28.8% |
| Net worth | 21,090 - 71.3% | 20,040 - 71.2% |
| Total liabilities and net worth | $29,570 - 100.0% | $28,150 - 100.0% |

Based on average net-plus-salary, the owners'take from 300 Lilly Digest pharmacies, whose average volume was closest to that reported by ACA, was higher -- both percentagewise and in actual dollars.

The following table compares the ACA average figures with the Lilly averages for pharmacies having (1) the closest comparable percentage of Rx to total sales and (2) closest total volumes:

|  | Lilly (60 to 75% Rx) (93 pharmacies) | ACA (158 pharmacies) | Lilly ($150-$200,000 sales) (300 pharmacies) |
|---|---|---|---|
| Total store volume | $97,082 | $174,150 | $173,669 |
| Rx volume | 66.1% | 58.1% |  |
| Gross margin | 42.5% | 42.1% | 34.5% |
| Total expenses | 35.4% | 37.6% | 29.2% |
| Net profit before taxes | 7.1% | 4.5% | 5.5% |
| Net plus owner's salary | 20.7% | 11.8% | 13.4% |
| Average inventory | $15,327 | $29,118 | $26,439 |
| Inventory turnover | 3.6 times | 3.4 times | 4.3 times |
| Inventory % of sales | 15.8% | 16.7% | 15.2% |
| Average no. of Rx's | 21,095 | 36,289 |  |
| Average Rx price | $3.04 | $3.10 |  |

## Rx Refills Continue to Spiral Upward -- Despite D-H Law

Rx business averaged 32.4% of total volume in 2,158 Lilly Digest pharmacies. In addition, Lilly noted that sales of non-Rx merchandise through the Rx dept. -- including over-the-counter pharmaceuticals plus Rx accessories -- "has been estimated" at 5 to 1 % of total sales, thus pushing total Rx dept. sales over 40% of total store volume.

Lilly Digest data also highlighted the fact that Rx refills "continue upward spiral." Refills made up 47% of the total Rx business in the Lilly stores in 1958, compared with less than 46% in 1957. Since the 1951 passage of the Durham-Humphrey (D-H) amendment to the federal food and drug law, which tightened control of refills, the refill ratio has risen to this point from 42.5% -- despite predictions that the new law would sharply constrict refill business.

Noting that the refill ratio fell in 1952 and 1953, Lilly commented: "This may have been a short-term after-effect of the passage of the D-H Act.... In 1956, Rx refills surpassed the pre-D-H record, and since then they have continued steadily upward."

"It seems probable," the Lilly Digest said further, "that after the 1952-1953 readjustment period, refill business was stimulated by the federal regulations. Practicing pharmacists immediately launched educational campaigns regarding the provisions of the law, and these produced a substantial increase in the number of Rx's which bore specific refill instructions."

August 10, 1959          F-D-C Reports          - 13 -

The Lilly Digest made special note, however, that some of the stores it surveyed in 1958 were "barely able to match their record in 1957, and others en-red a decline." The tabulation showed 15% of the reporting pharmacies operating at a loss in 1958 -- highest in recent years -- with another 15% reporting less than 2% net on sales.

These data suggest that the "inventory recession" felt by many drug-cosmetic mfrs. and whslrs. in 1958 may have been due in part to actual sales declines in independent drug stores. Independents, who are inclined to key their inventory policies to the diminishing frequency of cash register rings, apparently cut back on stock replacements. A reversal of this trend is evident in booming whsle. drug volume thus far in 1959.

Lilly also noted a "slight squeeze" on drug store net profits in 1958, with average net-before-taxes -- not including proprietor's withdrawals -- dropping from 5.5% of sales to 5.2%. Expenses rose 0.4% of sales, but three-fourths of the increase was in proprietor's withdrawals, and total income (net plus proprietor's withdrawals before taxes) remained at 13.2% of sales -- unchanged from '57.

Cost of Goods Rate & Turnover Rate Lower Than 10 Yrs. Ago; Gross Margin Up

Lilly showed the independent's average gross margin in 1958 was 34.7%, virtually unchanged from 1957. For 1958, 1957, and 1949 -- a decade ago -- Lilly reported operating ratios as follows:

|                     | 1958  | 1957  | 1949  |
|---------------------|-------|-------|-------|
| Cost of goods sold  | 65.3% | 65.4% | 67.6% |
| Gross margin        | 34.7  | 34.6  | 32.4  |
| Proprietor's salary | 8.0   | 7.7   | 7.6   |
| Employees' wages    | 11.2  | 11.2  | 10.5  |
| Rent                | 2.2   | 2.2   | 2.6   |
| Other expenses      | 8.1   | 8.0   | 5.8   |
| Total expenses      | 29.6  | 29.1  | 26.5  |
| Net before taxes    | 5.2   | 5.5   | 5.9   |
| Annual turnover rate | 3.8% | 3.9%  | 4.0%  |

The 1958 Lilly Digest continued to emphasize the importance of Rx business to total store income and profit. It includes scores of breakdowns analyzing operations in relation to (1) proportion of Rx volume to total sales and (2) number of Rx's filled daily -- both further broken down by volume brackets. For the 2,158 stores that reported specific Rx dept. data, Lilly said Rx gross margin averaged 47% of the selling price.

A comparison of Lilly Digest data with figures reported earlier by the American College of Apothecaries (ACA) seem to indicate that the pharmacist-owner -- based on his net-plus-salary -- does better with a general-type drug store (if it has a good Rx volume) than with an exclusive Rx shop. The Lilly Digest armacies include general-type stores and the ACA survey was based on figures from 154 exclusive Rx shops.

# Appendix 7

Selection from Eli Lilly & Co., The Modern Apothecary, (H.S. Noel ed., Lakeside Press, R.R. Donnelly & Sons Co. 1941)

# THE MODERN

# *Apothecary*

## A COMPENDIUM IN FOUR PARTS

A COMPILATION OF AUTHORITATIVE
MATERIAL CALCULATED TO PROVE
HELPFUL TO PHARMACISTS WHO
ARE PRIMARILY INTERESTED IN THE
PROGRESS AND DEVELOPMENT OF
THEIR PRESCRIPTION DEPARTMENTS

*Published by*

ELI LILLY AND COMPANY    INDIANAPOLIS, INDIANA, U.S.A.

# THE

# MODERN APOTHECARY

EDITED AND COMPILED BY

## H. S. NOEL

DIRECTOR TRADE RELATIONS

ELI LILLY AND COMPANY

## Study Prescribing Habits

A study of the prescribing habits and needs of the physicians in any given locality is helpful even if it is not altogether a specific against too much stock or too great a variety of stock. It is worthy of note that the National Drug Store Survey showed that from 44 per cent to 89 percent of a pharmacy's total prescription business could be accounted for by its ten leading physicians. That does not mean that a drug store should not endeavor in every way to cultivate the patronage of additional physicians. Far from it.

## An Aid in Balancing Stocks

As a guide for pharmacists confronted with the question of balanced stocks or an opening stock order, the leading ingredients that are found necessary in a drug store can be classified as follows: (1) chemicals; (2) galenicals and pharmaceuticals in general; (3) botanicals and oils; and (4) proprietaries and manufacturers' specialties.

The following table is based on the studies of Professor E. N. Gathercoal, covering over 120,000 prescriptions in four widely separated states, combined with the figures provided by the National Drug Store Survey.

According to the Lilly Digest, as the number of prescriptions filled in a drug store increases, the likelihood of unsatisfactory gross margins decreases for the entire store. The following table reflects this tendency.

### Percentages of Stores with Average Gross Margins Under 30 Percent of Sales

| | |
|---|---|
| 1 to 1,825 prescriptions | 51% |
| 1,826 to 3,650 prescriptions | 21% |
| 3,651 to 7,300 prescriptions | 25% |
| 7,301 to 14,600 prescriptions | 17% |
| 14,601 to 36,500 prescriptions | 25% |

It is of further interest to note the effect of prescription volume in increasing the average net profit per dollar invested in all store merchandise.



From the *Lilly Digest*

As prescription volume grows, certain basic stocks naturally may remain about the same but increased investment becomes necessary and more items must be carried. This is obvious. Less obvious, to many pharmacists, however, is the fact that the added

### Summary of Ingredients Which Occurred Five Times or More Each

| Type of Ingredient | Number of Ingredients | Percent of Total | Total Value of Opening Order | Average Cost per Item | Number of Times These Ingredients Were Prescribed | | |
|---|---|---|---|---|---|---|---|
| | | | | | Total | Percent of Total | Average per Ingredient |
| Chemicals............ | 164 | 24.0 | $ 93.51 | $0.57 | 22,087 | 51.3 | 135 |
| Galenicals............ | 234 | 34.2 | 206.15 | 0.88 | 11,357 | 26.4 | 49 |
| Specialties........... | 253 | 37.0 | 288.98 | 1.14 | 8,625 | 20.0 | 34 |
| Botanicals, Oils, etc.... | 33 | 4.8 | 17.13 | 0.52 | 983 | 2.3 | 30 |
| Total.............. | 684 | 100.0 | $605.77 | $0.89 | 43,052 | 100.0 | 63 |

A detailed list of the ingredients, each of which appeared five or more times in 120,000 prescriptions, will be found in *The Professional Pharmacy*, published by the American Pharmaceutical Association, Washington. D. C. While the list is not new, nevertheless it will serve as an excellent guide to the selection of items that should be available in the stocks of a prescription department.

which the average investment in stock has been turned into cash, both figures representing cost prices instead of sales prices.

Turnover is determined by dividing sales at their cost price for a given period by the average inventory of store merchandise at cost for the same period. Many druggists justify their large stocks on the ground that the lower purchase price provides higher margins; therefore, such buying practices should provide greater net profit. This is a reasonable conclusion. In fact, field studies prove that gross margins are higher in stores with large stocks and low turnover than they are in stores carrying smaller merchandise stocks and having a fast turnover. Studies of the operations of 611 drug stores reported in the Lilly Digest show that 9 percent of the stores identified as heavily stocked establishments by the slowness of the turnover had gross margins of less than 30 percent. On the other hand, 46 percent of the stores identified as not heavily stocked because of a turnover of five times a year or more had margins of less than 30 percent.



THE RELATION OF AVERAGE GROSS MARGINS TO AVERAGE ANNUAL RATE OF TURNOVER

PROPORTION OF STORES WITH GROSS MARGINS OF LESS THAN 30 %

9 %
20 %
22 %
31 %
46 %

Gross margin is one factor, net profit is another. An attempt was made, therefore, to determine how successful these same 611 stores were in converting gross margins into net profits according to the frequency of turnover. It was found that 51 percent of the stores turning stocks from once to twice

yearly made net profits of more than 5 percent on sales. These are the stores that were identified as quantity buying stores by the slow movement of stocks. It was found that 50 percent of the stores that turned stocks five or more times a year made more than 5 percent net profits on sales. This was interpreted as meaning that there was virtually no difference in the likelihood of a drug store obtaining a net profit of 5 percent or more whether the store bought in quantities with resultant slow turnover or purchased stocks with the idea of securing a rapid turnover.



THE RELATION OF NET PROFIT TO AVERAGE RATES OF TURNOVER OF MERCHANDISE STOCKS

STORES WITH NET PROFITS OF MORE THAN 5 %

51 %
48 %
53 %
52 %
50 %

The real measure of success of a drug store is the amount of return obtained from each dollar invested. It is the criterion of success in the purchase of bonds, in the real estate business, or in the operation of a drug store. The paramount consideration is always the same. What does the investment yield?

Some pharmacists invest for gross margins in the hope that these margins will produce correspondingly large net profits. Some pharmacists try to increase the net profit by seeking a rapid turnover of stock. It is therefore particularly interesting to study the operations of these 611 drug stores from the angle of the average net profit these stores obtained, according to the turnover, per dollar invested. This is the same group of stores, studies of which revealed that the